82 A.3d 943

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Alfonso SANCHEZ, Appellant.**

Supreme Court of Pennsylvania.

Argued May 8, 2012.

Decided Dec. 17, 2013.

258

Stuart Brian Lev, Esq., Helen A. Marino, Esq., Defender Association of Philadelphia, for Alfonso Sanchez.

Thomas Gary Gambardella, Esq., Office of the District Attorney, Stephen B. Harris, Esq., Michelle Ann Henry, Esq., Robert J. Salzer, Esq., Maureen Flannery Spang, Esq., Bucks County District Attorney's Office, Amy Zapp, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

Before: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice McCAFFERY.

This is a direct appeal *nunc pro tunc* from a death sentence imposed after a jury convicted Appellant of two counts of first-degree murder for the shooting deaths of Mendez Thomas and Lisa Diaz, both of whom were killed by gunshots to the head fired at close range. The jury concluded, with respect to the circumstances of the murder of Mendez Thomas, that the aggravating factors did not outweigh the mitigating factors, and thus imposed a sentence of life imprisonment. With

respect to the murder of Lisa Diaz, the jury concluded that the aggravating factors, which included that the killing occurred during perpetration of a felony burglary and that Appellant had murdered Mendez Thomas only seconds before, outweighed the mitigating circumstances. Thus, the jury imposed a sentence of death for that offense. The main issue presented in the present appeal is whether the evidence was sufficient to support the jury's verdicts of guilty with respect to burglary and conspiracy to commit burglary. Appellant argues that because there was insufficient evidence to prove that the killings had been committed during the perpetration of a felony, the jury considered a non-existing aggravating circumstance when it imposed the sentence of death. For the reasons that follow, we affirm.

The facts, when viewed in the light most favorable to the Commonwealth as verdict-winner, are that on October 16, 2007, Appellant and two co-conspirators, Alex Martinez ("Martinez") and Steven Miranda ("Miranda") (collectively "the trio"), spent the evening hours smoking marijuana and drinking alcohol at various locations in Philadelphia and Bucks County. At some point during the night, the trio decided that they would go to the Bucks County apartment of Mendez Thomas ("Thomas") to assault him. Miranda arranged by phone to meet Thomas under the ruse of wanting to procure marijuana. Appellant drove the trio to Thomas's apartment in a tan Ford Explorer. When they arrived near midnight, Thomas and his paramour, Jessica Carmona ("Carmona"), who shared the apartment with Thomas and their two young children, were not home. Instead, Lisa Diaz ("Diaz"), the sister of Carmona and the girlfriend of Miranda, was in the apartment with the two children. She opened the door to Miranda and the trio entered.

Several minutes later, Thomas and Carmona arrived, and shortly thereafter, a physical and verbal altercation between Thomas and Appellant ensued during which Appellant displayed a gun. Thomas began to retreat down a hallway toward a bedroom. Appellant advanced into the hallway and shot Thomas in the head from a distance of six to ten inches,

killing him instantly. Appellant emerged from the hallway, turned, and fired two shots at Diaz, one of which struck her in the shoulder, and she fell to the floor. Appellant then advanced to where she lay and shot her in the head. Prior to fleeing the apartment, Appellant fired a shot at Carmona, who was in a protective fetal position on the floor, shielding her two-year-old son beneath her. The bullet passed completely through Carmona's leg, and she was able to get up and call 911. She informed the dispatcher that numerous persons had been shot, identified "Alfonso" as the shooter, and stated that the shooting had been "a set-up." Notes of Testimony ("N.T.") Trial, 9/22/08, at 176.

The next day, Martinez and Miranda voluntarily surrendered themselves to police and gave statements that implicated Appellant as the shooter, and asserted that the purpose of their collective visit to the apartment had simply been to purchase marijuana, and not to assault anyone. Both men were charged with multiple counts of criminal homicide and related offenses including burglary and conspiracy to commit burglary for their roles in the events of the previous night. Appellant, meanwhile, had fled to Altoona, but soon returned to Horsham, Montgomery County, to the home of a boyhood friend. He was apprehended there on October 25, 2007, while attempting to conceal himself in an upper floor bathroom of that residence. Three days later, the police recovered the Ford Explorer that Appellant had been driving on the night of the killings. The vehicle was registered in the name of Appellant's mother, and a 9 mm. handgun, later determined to be the murder weapon, was retrieved from the rear passenger-side floor of the vehicle. Appellant was charged with multiple counts of criminal homicide and related offenses, including burglary and conspiracy to commit burglary.

Appellant, Martinez and Miranda each had separate counsel, and their joint preliminary hearing was scheduled for November 2, 2007. It was continued first until December 7, 2007, at the request of Appellant's counsel, Jack McMahon, and then twice more, both times at Mr. McMahon's request, until February 8, 2008. On that date, counsel for Appellant's co-

defendants were present, but Mr. McMahon failed to appear; the Magisterial District Justice conducted the preliminary hearing despite Mr. McMahon's absence, and all charges against all defendants were held for court.

Thereafter, Mr. McMahon filed a motion requesting a remand for a preliminary hearing, and a hearing on the remand motion was scheduled for March 7, 2008. On that date, the court received a letter by facsimile indicating that Mr. McMahon was out of the country on a pre-paid vacation until March 15, 2008; the court dismissed the remand motion. Ultimately, despite the court's dismissal of the motion, the Commonwealth agreed to re-conduct Appellant's preliminary hearing. On May 22, 2008, a second preliminary hearing just for Appellant took place with counsel present, and the charges against Appellant, including burglary and conspiracy to commit burglary, were once again held for court.[1]

On September 30, 2008, after a seven-day long jury trial at which Appellant and Miranda were tried jointly, Appellant was found guilty of two counts of murder in the first-degree and fifteen related counts, including burglary, attempted homicide, aggravated assault, possession of an instrument of crime, criminal conspiracy (to commit criminal homicide, burglary, aggravated assault, and possession of an instrument of crime), flight to avoid apprehension, and recklessly endangering another person.[2] On October 2, 2008, with respect to the murder of Lisa Diaz, the jury returned a sentence of death.

---

**1.** Earlier that same day, Martinez pled guilty to burglary and conspiracy to commit burglary in exchange for the Commonwealth's agreement to drop criminal homicide and all other charges against him. Martinez was subsequently sentenced to serve a term of 4 to 10 years' imprisonment for his role in the crimes. At Appellant's preliminary hearing, Martinez testified, among other things, that Appellant had directed Miranda to call Thomas on the night in question "and to ask for marijuana, so he [Appellant] could get close to [Thomas] and [Appellant] wanted [Miranda] to fight [Thomas]." N.T. Preliminary Hearing, 5/22/08, at 6. Martinez also identified Appellant as the shooter. *Id.* at 12.

**2.** Miranda was convicted of murder in the second degree, among other things, and was subsequently sentenced to life imprisonment. There are no issues before us with respect to the cases of either Miranda or Martinez.

## Trial

The Commonwealth's theory of the case was that Appellant, Miranda and Martinez had conspired to assault Thomas in his apartment using Miranda's association with Diaz and the ruse of attempting to obtain marijuana from Thomas to gain entry. The Commonwealth further theorized that once inside, during the assault on Thomas, Appellant, who had brought a handgun, shot three people, killing two of them. The defense theory of the case was that Appellant had only intended to obtain marijuana from Thomas, had no knowledge of any weapon, and was simply present at the scene when Miranda went on a homicidal rampage.

Dr. Ian Hood, the forensic pathologist who performed autopsies on the bodies of Thomas and Diaz, testified at trial that Thomas had suffered a single, immediately fatal gunshot wound to the head, fired from a distance of six to ten inches. He further testified that Diaz had been shot twice: once in the right shoulder, which would not normally have been a life-threatening wound, and once in the head, which had been a rapidly fatal wound. He testified that Diaz had been shot from a distance of up to three feet.

Detective James Boston of the Warminster Township Police Department testified that he was part of the team responsible for processing the crime scene on the night of the shootings, and he described the apartment, the locations of the victims, and the recovery of 9 mm. caliber shell casings, bullets, and bullet fragments from the crime scene. He testified that he had recovered bullets and/or fragments from within the wall in the hallway next to where Thomas's body had been found; from within a closet door in the living room; from within linens and sheets in that closet; and also from the concrete in the floor beneath the living room carpet. He testified that the fragment below the carpet had been part of a bullet that had passed through a child's play-pad lying on the floor. He also testified that a .45 caliber handgun had been found in a rear-bedroom closet.

Officer Sean Harold of the Warminster Township Police Department testified that Miranda and Martinez had voluntarily surrendered themselves to police on October 17, 2007, and that at that time, Appellant had not yet been located. He also testified that on October 28, 2007, he recovered a 9 mm. Hi–Point Luger from the rear passenger-side floor of a tan Ford Explorer registered to Darlene Sanchez, Appellant's mother. Montgomery County Detective John Finor, a firearms and ballistics expert, testified that, by using tool-mark identification procedures, he had determined that the bullets, fragments and casings recovered from the crime scene had been fired from the 9 mm. Hi–Point Luger recovered from the Explorer.

Bucks County Detective Mark Zielinski testified that, during a search of the location in which Appellant had been arrested on October 25, 2007, police had recovered a gym bag belonging to Appellant that contained several boxes of black hair dye, as well as newspaper clippings that identified Appellant as "wanted" and warning that he should be considered armed and dangerous. Photos of the newspaper clippings were marked as trial exhibits and entered into evidence. Defense counsel did not object to their admissibility, conceding that they were relevant to show consciousness of guilt. However, counsel did object to publishing a photo of one of the clippings to the jury. Below the main headline, the challenged clipping contained a smaller headline that read: "DA: Two were killed over drug debt." Counsel maintained that there had not been any evidence presented by that point in the trial to substantiate any motive for the shootings. The court agreed, and the photo of that clipping was not published to the jury. A photo of the remaining clipping with a headline that read "Authorities Vow to Find Shooter," that showed a photo of Appellant, named him, identified him as wanted and warned that he should be considered armed and dangerous, was published to the jury. The court gave the jury a cautionary instruction that the photo was introduced only for the limited purpose to show that the newspaper had been in Appellant's possession at the time he was apprehended.

The Commonwealth presented the testimony of the surviving victim, Jessica Carmona. She testified that on October 16, 2007, she and Thomas and their two children were living in apartment number H1–3, a basement unit in the Bucks Landing Apartments located at 120 East Street Road in Warminster, Bucks County. She testified that Thomas had sold marijuana occasionally, and had sold marijuana to Miranda in the past. At approximately 10:30 p.m. on the night in question, she and Thomas had gone to visit a neighbor in an apartment across the hall from theirs. Carmona's sister, Lisa Diaz, remained in the apartment, baby-sitting for the children. While in the neighbor's apartment, Thomas consumed several beers and smoked some marijuana. Thomas had also taken two prescription Xanax tablets prior to going to the neighbor's apartment.

Sometime between 11:00 p.m. and 11:30 p.m., Thomas received a phone call on his "walkie-talkie" type cell phone, which permitted Carmona to hear both ends of the conversation. The call was from Miranda, Diaz's boyfriend, who inquired about procuring some marijuana from Thomas. Thomas told Miranda that he would call Miranda later to finalize the details of an exchange. During that conversation, Carmona also heard another voice broadcast, pretending to be Miranda; she believed the voice had been that of Appellant, whom Carmona had known from the neighborhood but had not seen for years. Carmona took the phone from Thomas and asked, "Who is this?" to which the caller replied "Steven [Miranda]," to which Carmona retorted, "This is not Steven." N.T. Trial, 9/22/08, at 149–151.

Carmona further testified that when she and Thomas later returned to their own apartment, they found Miranda, Martinez, and Appellant there with Diaz and the children, and Diaz, by her mannerisms and facial expression, appeared to be frightened. Appellant immediately asked Carmona, "Do you remember me?" and she replied, "Yes, you're Alfonso." *Id.* at 159. As Appellant asked Carmona this question, he gave her "an intimidating look" by "shaking his head" as if Carmona "had done something wrong to him." *Id.* at 207–208.

Carmona testified that shortly after this, she saw Thomas accidentally step on Appellant's foot. At first, Appellant responded by "having words" with Thomas, and then he pushed Thomas toward Miranda. *Id.* at 161–162. At that point, Diaz placed herself between Thomas and Appellant, and said, "No. This is not going to happen." *Id.* at 163. Carmona testified that she then told Appellant and the others, "You have to get out of my house." *Id.* She further testified that Miranda then handed a CD player and headphones to Martinez. At that point, Thomas began walking from the living room toward a hallway leading to a bedroom. Carmona testified she then saw Appellant walk toward the hallway, draw a gun from his waist and raise it. Carmona then screamed out to Thomas "get the gun," referring to a .45 caliber handgun she kept in a closet in the bedroom. *Id.* at 226. Carmona testified that she saw Appellant point the gun he had drawn from his waist at Thomas and pull the trigger, and heard the shot but did not see Thomas fall because her view was obstructed by the hallway wall. Carmona further testified that Miranda and Martinez fled together immediately after Appellant shot Thomas.

Carmona testified that within seconds after firing the first shot, Appellant turned to his left and shot Diaz, who fell to the ground. At the time, Carmona's daughter was on the couch approximately two feet from Diaz. Appellant took several steps forward, "and he shot her [Diaz] again." *Id.* at 171. Carmona testified that she grabbed her son at that point and "I covered him. I fell to the floor, and covered him, because I knew I was going to be next." *Id.* at 172. She testified that she assumed a fetal position on the floor, covering her son with her entire body. When asked by the prosecutor, "After you covered your son, in that fetal position, what happened next?" Carmona replied, "[Appellant] shot me." *Id.* After shooting Carmona, "[Appellant] ran out the door." *Id.* at 173. Carmona testified that after Appellant fled, she checked on Thomas, who was not moving, and Diaz, who was making "gurgling" sounds, and she then took her children "across to the neighbor." *Id.* at 174–175. Carmona testified that "as

soon as I took the kids across the hall ... I came back in and dialed 9–1–1." *Id.*

At that point in the trial, the parties stipulated to the admissibility and accuracy of an audiotape recording of the 911 call, which was played for the jury. A transcript of the call was also distributed to the jurors to permit them to follow and read along as the tape was played. During the call, Carmona told the dispatcher that "Alfonso" had been the gunman, and that the incident had been a "set up." [3] *Id.* at 176. When asked by the prosecutor why she had used the words "This was a set up" during her call to 911, Carmona replied, "What made me say that, was because [Appellant] didn't know where I lived, and [Miranda] did." *Id.* at 179. Moreover, Carmona testified that during the time she "was on the phone with 9–1–1," she had been searching for her handgun but could not find it, so she told the dispatcher that she thought her gun had been taken by Appellant. *Id.* She then testified that after the police arrived, they "went to go look for it [her gun], they found it." *Id.* She concluded her direct-examination testimony by stating that she had no doubt in her mind that Appellant had been the person who had shot her and who had killed Thomas and Diaz. *Id.* at 180.

The Commonwealth also presented the testimony of Betsy Lopez, who related that she had known Miranda since he had been "seven or eight years old," and that Diaz had been "one of my best friends." N.T. Trial 9/22/08, at 106–108. Ms. Lopez also testified that she had dated Appellant briefly. She testified that one week before the killings, Miranda had told her that he was "selling cocaine to pay off a debt to someone else." *Id.* at 111. She further testified that on the night of the killings, she was with Diaz in the apartment at approximately 11:40 p.m., when Diaz received a call from Miranda on

---

**3.** The record certified on appeal to this Court contains neither the audiotape nor the transcription of the 911 call which was stipulated to by the parties as admissible and accurate; however, there are numerous references in the record to the specific context and content of the 911 call and to these specific utterances in particular. Thus, we consider the transmission of this information during the call to be a fact of record.

a walkie-talkie type cell phone, indicating that he was coming over shortly. He did not mention that anyone else was with him. Ms. Lopez left the apartment within a few minutes after the call concluded.

Martinez testified at trial that at approximately 5:30 p.m. on the evening of the shooting, he had seen Miranda with Diaz in a parking lot in Warminster. After Diaz left, Martinez joined Miranda, and Appellant pulled up shortly thereafter in his Explorer, telling them to get in. Appellant first drove the trio to a liquor store, where Appellant purchased a bottle of vodka, and then to the home of a friend of Appellant in Hatboro, Bucks County. At the Hatboro residence, the trio and Appellant's friend drank vodka and smoked marijuana and Appellant's friend smoked "crack" while Appellant repeatedly played a song on his friend's sound system entitled "Somebody's Gonna Die Tonight" by a rap artist named "50 Cent." N.T. Trial, 9/28/08, at 101–104. At some point, Appellant received a call on his cell phone and informed Martinez and Miranda that it was time to go. He then drove them to a garage in Philadelphia, where Appellant and Miranda met with a male named Angel for approximately twenty minutes in a room separate from the room in which Martinez remained watching television. Appellant then drove the trio to a parking lot across the street from the home of Appellant's girlfriend, Amber Schempp, in Warminster Heights, where the trio sat inside the Explorer and continued to smoke marijuana.

While sitting there, Appellant told Miranda "out of the blue, call that person you been having problems with, Mendez [Thomas]." *Id.* at 110. Miranda made the call, asked Thomas if he had any marijuana, and Thomas answered that he did. The call was made on a walkie-talkie type cell phone, so Martinez could overhear both ends of the conversation. Martinez then testified as follows:

And that's when I seen [Appellant] lean over toward [Miranda] and snatch the phone out of [Miranda's] hand and he tried to disguise his voice to sound like [Miranda] and he numerous times kept asking [Thomas] do you have an eight

ball of coke? Do you have an eight ball of coke? And [Thomas] kept telling him, no.

*Id.* at 116.

Martinez also testified that Appellant told Miranda "when we go over to his apartment, if you are going to fight him, don't bullshit[.]" *Id.* at 114. Martinez explained that "not to bullshit" meant that Miranda "should prove himself to [Appellant]." *Id.* at 115. Martinez continued, "He [Appellant] is talking to Steven [Miranda], telling him not to bullshit. If you are going to fight Mendez [Thomas], to fight him." *Id.*

Martinez testified that following the call with Thomas, Appellant had very briefly gone inside his girlfriend's house, and that when he returned, he drove the trio to a convenience store on Street Road in Warminster, where Appellant bought "blunts" and Martinez bought snacks while Miranda remained alone inside the vehicle. *Id.* at 119. Thereafter, Appellant drove a short distance via an indirect route suggested by Miranda to a street adjacent to the parking lot of the apartment complex in which Thomas resided. The trio got out of the vehicle and walked down a pathway to Thomas's apartment building. Martinez testified that he agreed to go into the apartment because if Miranda needed assistance in "fighting" Thomas, then Martinez would "have to fight, too." *Id.* When the trio arrived at the apartment door, Miranda and Martinez stood directly in front of the door, but Appellant stood off to the side.

Martinez testified that Miranda knocked on the apartment door and Diaz opened the door, greeting Miranda with a hug and kiss. Martinez followed Miranda into the apartment and Diaz greeted him in a friendly manner as well, calling him by his nickname "Doobie." *Id.* at 130. Martinez testified that Appellant had been the last to enter the apartment, and that upon Appellant's entry, Diaz suddenly appeared "terrified," as if she had "just seen the devil walking into the apartment." *Id.* at 131. Martinez testified that he saw two children in the apartment, a little girl sleeping on the couch, and a little boy running around in circles. Miranda asked Diaz where Thomas

was, and she answered that he was next door visiting a neighbor.

Martinez further testified that within two minutes of his arrival with Miranda and Appellant, Thomas and Carmona entered the apartment. Miranda, who had been holding a CD player, attempted to hand the CD player to Martinez in his preparation to "fight" Thomas, but Martinez "shook [his] head no," declining to take it. *Id.* at 139–140. At that point, Appellant shoved Thomas toward Miranda, telling Thomas to "watch where you're walking." *Id.* at 142. Diaz and Carmona then attempted to intervene between Appellant and Thomas. Thomas began walking toward the hallway, and Appellant began running toward him. As Appellant ran toward Thomas, Martinez saw Appellant draw a black handgun from his waist, saw a "flash go through the hallway," and heard a "loud bang" and "something fall in the hallway." *Id.* at 144–147. Martinez then ran out of the apartment, following Miranda, who had already fled. Martinez testified that just past the landing outside the apartment door, while he was running up the steps to flee the building, he heard three or four more shots.

Martinez additionally testified that once outside the building, as he was running away, he realized Appellant was chasing him, gun in hand. Appellant caught up to Martinez in a wooded area, knocked him down and asked him, "[W]here the fuck do you think you're running to?" *Id.* at 160. Appellant ordered Martinez to "get up" and Martinez "surrendered" himself to Appellant. *Id.* at 161. Appellant directed Martinez at gunpoint to walk through the woods to Appellant's girlfriend's house. They arrived within five minutes and were admitted, and Appellant told his girlfriend that he had shot and killed Thomas and Diaz and that he had shot Carmona "but he wasn't sure if he killed her because he wasn't focusing on aiming at his target." *Id.* at 163–164.

Martinez testified that Appellant's girlfriend retrieved Appellant's vehicle, after which Appellant then drove Martinez to Philadelphia. While on the way, Appellant called someone on the phone and said "I'm going to call my sister and have her open the back door for you." *Id.* at 167. Appellant then

drove to his sister's residence where they found Miranda and spent the night. The trio separated the next morning when Appellant left on foot, and Miranda drove the vehicle to a location near a day-care center and parked it. Before Miranda and Martinez surrendered themselves to police later that day, Miranda told Martinez to tell the police that it was Martinez, not Miranda, who had called Thomas the previous night. After they had surrendered themselves, Miranda had become "stressed" and "worried" because he thought a "bullet" had been accidentally dropped at the location where he had parked Appellant's vehicle earlier that morning. *Id.* at 182–185.

Additionally, on direct examination, Martinez testified that portions of the statement he had given to police on the day after the killings had been untrue. Specifically, Martinez testified that at Miranda's urging, he had initially told police that the trio had only gone to the apartment to purchase marijuana, and that it was Martinez, not Miranda, who had called Thomas. At trial, Martinez admitted that those statements had been purposefully false, and, during cross-examination by Appellant's counsel, he testified that certain other factual portions of his earlier statement to police regarding where and with whom he had gone after the shootings had also been lies. He also admitted that, at Miranda's behest, he had lied when he told the police that, during the altercation in the apartment, Diaz had urged Thomas to retrieve a gun, stating during his testimony that "that never happened." N.T. Trial, 9/25/08, at 118. Additionally, on cross-examination, Martinez affirmed that there had been "no trickery" to get into the apartment, that the trio had not entered the apartment "under false pretenses," and that an exchange of cash for marijuana between Miranda and Thomas had taken place shortly after the trio arrived. *Id.* at 99–110. On re-direct, Martinez testified that the purpose of the trio's visit to the apartment was for Miranda to fight Thomas in order to prove himself to Appellant, and that purchasing marijuana was a ploy in order to gain entry, and that Miranda had not revealed

to Thomas or Diaz that Appellant would be coming along. He also testified that his trial testimony had been the truth.

At the close of the Commonwealth's case-in-chief, Appellant and Miranda both argued motions for judgment of acquittal as to the charges of burglary and conspiracy to commit burglary. They argued that the Commonwealth's evidence was insufficient for the jury to reasonably conclude that the trio had entered the apartment with the intent to commit an assault therein. The Commonwealth responded that Martinez's testimony provided sufficient evidence to establish the crimes of both burglary and conspiracy to commit burglary. The court denied the motions.

Appellant testified in his own defense. He testified that on October 16, 2007, he had been visiting his girlfriend in Warminster and had been trying to phone Miranda all day in order to get some marijuana from him. He finally reached Miranda at about 5:00 or 5:30 that evening and asked him for some marijuana. When Miranda replied that Appellant should meet him "up in the park," Appellant drove his Explorer to a park on Evans Street in Warminster and saw Miranda there with Martinez. N.T. Trial, 9/26/08, at 34. Appellant told them both to get in, and he then drove to a liquor store where he purchased a bottle of vodka. He then drove the trio to the home of a friend of his in Hatboro, where everyone drank and smoked Miranda's marijuana for a number of hours. *Id.* at 36–38. When the marijuana ran out, Miranda asked Appellant to drive him to Northeast Philadelphia so he could buy some cocaine, which Appellant agreed to do in exchange for more marijuana. Appellant then drove Miranda and Martinez to a residence in Northeast Philadelphia, and Miranda went inside by himself for approximately five minutes.

When Miranda returned, Appellant began driving the trio back to Warminster, and Appellant asked Miranda "if he had that weed." *Id.* at 41. Miranda replied that he had none, and would have to call someone. Miranda then used his walkie-talkie type cell phone to call "a dude named Dez," (*i.e.*, Mendez Thomas). *Id.* at 41–42. Appellant testified that he

could hear both ends of the conversation and that he "heard [Miranda] say something about 'you got that what you owe me?' Because he said that Dez had owed him some weed. And Dez said, 'yeah, I got it. Come to my house.'" *Id.* at 42. Appellant testified that he did not know anyone named "Dez," that the foregoing was the full sum and substance of the conversation, and that the conversation had been between Miranda and "Dez" only.

Appellant testified that he then drove to a 7–11 convenience store to buy "blunts," and thereafter, Miranda directed him to drive to a "back spot . . . he [Miranda] took us to this alleyway to walk to the apartments, and that's when we went to Jessie's [Carmona's] house." *Id.* at 43–44. Appellant testified that he and Martinez followed Miranda to the apartment, where Miranda knocked on the door and Diaz, Miranda's girlfriend, whom Appellant had met before, opened the door and greeted everyone in a friendly manner, including Appellant. He testified that she did not appear frightened, and that he had never had a problem with her. He testified further that there were no children in the room.

Appellant then testified that within two minutes of the trio's arrival at the apartment, Thomas and Carmona entered. Appellant testified that he had been standing next to the doorway, with his back against the wall when they entered, and that he had not been paying much attention to what was going on because he was under the influence of alcohol and marijuana, and because his concentration had been fixed on his phone, which he had been "playing with." *Id.* at 48–51. He did notice that Carmona, upon entering the apartment, had immediately gone to Diaz, and that they both had been sitting on a couch in the living room, and that Thomas had gone immediately to Miranda, and Appellant "thought" that "they was making a trade for the weed." *Id.*

Appellant's testimony on direct examination continued as follows:

Q: Okay. Now, while you're standing there in this condition that you've described, and they are doing what you think they're doing, what happens next?

A: I was still messing with my phone for like, about ten more seconds, and all of a sudden [Thomas], he took like three big, fast steps towards me.

Q: Away from Steven Miranda?

A: Away from Miranda, and he kind of almost nudged into me. But then I seen him take off towards the hallway, and that's when I seen Miranda chasing after him, behind him, and I looked up to see what was going on, and all of a sudden it was a big flash, boom, and I just turned around, opened the door, and ran out and Martinez ran out behind me.

*Id.* at 51–52.

Appellant next testified that the "boom" sounded like a gunshot and that as he ran from the apartment, he heard more gunshots. *Id.* at 53. Immediately following the above testimony, as Appellant's counsel attempted to elicit responses from Appellant regarding precisely where everyone in the room had been and in which directions everyone had moved when the shooting started, Appellant's counsel asked for a sidebar conference, at which the following exchange took place:

MR. McMAHON: Judge the two detectives that are sitting there at the table, and I'm standing right next to them, they are laughing. They are rolling their eyes. They were. I want them excused from the courtroom now.

THE COURT: Hold on, please. Hold on. I did not observe it. I have a view of the entire courtroom. I'll direct you, Mr. Gambardella, very calmly—

MR. GAMBARDELLA [the prosecutor]: Sure.

THE COURT: —to say to them they are to remain stoic, and unemotional, and say nothing. I'm not suggesting it did occur, but it will not occur any further if it has.

MR. GAMBARDELLA: I had been standing right there.

THE COURT: Did you see it?

MR. GOODWIN: [Counsel for Miranda] I was not paying attention to them.

THE COURT: How about you?

MR. ABAZA: [Co-counsel for Miranda] I did see smiling.

THE COURT: Well, that has to stop.

MR. McMAHON: I didn't make it up Judge, I'm not—

THE COURT: Your credibility is not an issue. I'm saying that I didn't see it, but it will not occur.

MR. McMAHON: Thank you.

MR. GAMBARDELLA: I'll tell them right now.

(Sidebar concluded.)

*Id.* at 56–57.

Counsel did not ask for a cautionary instruction and the court gave none. Appellant next testified that after fleeing the apartment, he and Martinez ran toward the home of Appellant's girlfriend and arrived there within five minutes of the shooting. Appellant did not tell his girlfriend anything about the events that had just occurred, but "just told her to get my truck because I was too drunk to drive." *Id.* at 59–60. Appellant testified that when his girlfriend retrieved the vehicle, he "grabbed the keys off her, and I told her I had to take Martinez somewhere, and I said he was going to drive because I can't drive, but I took the keys anyway and I drove." *Id.* at 62.

Appellant testified that he began calling Miranda to try to locate him, and that ultimately, he and Martinez "met up" with Miranda in Philadelphia, and Appellant drove the trio to the home of his friend Angel Rodriguez, where Appellant told Miranda and Martinez "to wait in the truck" while Appellant checked to see if Rodriguez was home. *Id.* at 66. Rodriguez opened the door, and Appellant entered and told Rodriguez the "situation, what had happened, but not word for word.... I just said, yo, something terrible happened. We need t[o] chill in here for a little bit, and he is, like, all right." *Id.* at 67. Appellant testified that as he returned to the vehicle to inform Miranda and Martinez that they could come inside, "they took off with the truck." *Id.* Appellant testified that he never saw the vehicle again, and that, on the night in question, the only person who had occupied the rear passenger seat had been Miranda. *Id.* at 68–69.

Throughout his testimony on cross-examination, Appellant continued to present a version of events that conflicted with the versions presented by the Commonwealth's witnesses. For example, Appellant denied that he had taken the phone from Miranda when Miranda called Thomas, and maintained that he had not heard a female voice broadcast over the phone during that conversation. Appellant denied that he had stood to the side when Miranda knocked on the apartment door, and denied that there had been children in the apartment. Appellant denied that Diaz had appeared frightened when he entered the apartment, and denied that he had asked Carmona if she remembered who he was when she entered the apartment or that he had spoken or acted in an intimidating or threatening fashion. Additionally, Appellant denied that Diaz and Carmona had attempted to intervene between Appellant and Thomas. He denied that anyone had urged Thomas to get a gun. Ultimately, Appellant maintained that because he had been inebriated and had been looking down at his phone, he had not seen and did not know precisely what had transpired between Miranda and Thomas prior to when Thomas hurriedly took several steps away from Miranda. Nevertheless, Appellant testified that Miranda had been the shooter, and suggested that Miranda's motive for the killings may have been that Thomas had "owed" Miranda something that had not been repaid, perhaps marijuana or cocaine. *Id.* at 97–99.

During his closing remarks to the jury, Appellant's counsel frequently suggested that the jury should be skeptical of the testimony of Martinez and Carmona. With respect to Carmona, counsel characterized a portion of her testimony—specifically, her testimony that a verbal and physical altercation between Appellant and Thomas had occurred—as "a total fabrication." N.T. Trial, 9/29/08, at 49. Counsel continued in that manner, as follows:

> Interesting in evaluating Jessica Carmona—it's interesting in that we've heard from Alex Martinez ... [that] after March of '08, [he] began to cooperate with the government. And he gave a statement at that time, about this ... CD [player]. Remember that about the CD [player and head-

phones] being taken off, and that [Appellant] pushed [Thomas] toward Miranda? Do you remember that testimony? [Carmona] knew—I suggested to you at that point in time— what Martinez was saying[.] I said that because when you look at her preliminary hearing [testimony] and we look at her statement of October 17th, nowhere, nowhere in her testimony under oath or in her statement does this whole concept of headphones come in, [headphones] being taken off, being handed to [Martinez], anything whatsoever, nor does this whole concept of [Appellant] pushing [Thomas] towards [Miranda] ever come into play either. It only comes into play when she testifies here, coincidentally enough after Martinez cooperates with the government and he throws that little fact into the mix, and now she comes forward with it. Why should she leave all those things out, and then just amazingly remembers that now? Because it never happened.

*Id.* at 50 –51.

Appellant's counsel also highlighted perceived contradictions between the testimonies of Martinez, Carmona, and Appellant with respect to anyone having urged Thomas to "get a gun," as follows:

[Carmona] tells you, in her statements, and everything she says, what I said to [Thomas] was go get my gun[.] ... Mr. Martinez told you [no one said] to go get a gun. And you heard from [Appellant] that that never happened. Why did she [Carmona] add that and what does that mean to this case?

Well, you heard Alex Martinez sa[y] that that never happened. The government's own witness, sat right there and said that never happened. [Appellant] told you that never happened, [that Carmona] never said anything about going to get your gun. Yet, what was interesting about that is, that in Martinez's first statement, the one-the famous lie statement, where he lied, lied, lied, in that first statement. [sic] One of the things he supposedly lied about was that- and he said [Diaz] as opposed to [Carmona], but nonetheless, somebody said go get your gun. And [Martinez] said,

I lied about that. That was never said. I lied about that. And, lo and behold, [Carmona] said the same thing. Why did Alex Martinez lie about that? Why did he make that up? He made that up because Steven Miranda told him to make that up. Steven Miranda said to him, make that up about them going to get a gun. Why would Steven Miranda be so concerned of making up a story about the other people going to get a gun? I'll tell you why, because he wants to make it look like he shot in self-defense. That he had no other choice but to shoot. That's why he's telling Alex Martinez to say, she [told Thomas] to get a gun, and you know that's a lie.

Why, Mr. Gambardella? Please tell me why [Miranda] would tell Mr. Martinez to lie about that fact? Why would [Miranda] say, Martinez, when you go in there tell them [Thomas] is going to get a gun; if Mr. Miranda did nothing? He didn't shoot anybody. He didn't have a gun. He wasn't intending to shoot anybody. Why would he make [Martinez] lie about that fact, unless [Miranda] is the one that shot [Thomas] and he's trying to build up some sort of story to try to create some concept of self-defense or justification for his actions.

Interesting enough, then, lo and behold, the statement that we know to be a lie from Alex Martinez's own mouth, a lie … for Steven Miranda, who comes in and tells that same lie? Jessica Carmona. Hmmm, what a coincidence. Why is she telling the same lie? The same lie. Did someone talk to her too that evening? Because the statement wasn't until that evening on October 17th. Did someone talk to her and tell her that that's the version that Miranda is putting out there? Why would she lie about that?

*Id.* at 52–55.

In contrast to his arguments with respect to the credibility of Carmona and Martinez, Appellant's counsel argued in support of Appellant's credibility as follows:

I suggest to you that the demeanor [Appellant] presented to you [during his testimony], in the face of cross-examination by two experienced lawyers, Mr. Miranda's lawyer and Mr.

Gambardella, he didn't flinch. He didn't miss a beat. He didn't trip up in any way whatsoever. There wasn't an inconsistency in any way, shape, or form despite all the attempts by everybody who questioned him. And do you know why that is ladies and gentlemen? The reason that is, is because the truth is always the truth. It will remain the truth. You could tell it five years from now. Ten years from now, and it will always be the truth.

. . . .

He told the story as it was. He never got rattled. He never told a different story. It is the way it was and he defended himself because the truth is the truth whether it's October 16th [2007] or September 28, 2008. The truth will always remain the same and that is what he told you[.]

*Id.* at 87–88.

During his closing remarks to the jury, the prosecutor noted that Carmona had been a victim of the crimes, had acted heroically in protecting her son, and had never wavered in her identification of Appellant as the shooter. In relevant part, the prosecutor argued as follows:

You heard Mr. McMahon say a lot of things [about Carmona]. I'm just going to—I'm going to suggest to you that there's three things that are undisputable about her. One, she is a victim. She is a victim in so many ways. She not only got shot herself through the leg, but she had to witness the father of her children be killed and within feet of her, her sister, who she is close to, be murdered.

. . . .

The second thing she is, she is an unimpeached witness. Now, Mr. McMahon wanted to dump on her in so many ways, and really victimized her with these allegations. But what—

MR. McMAHON: Objection, Your honor. I didn't victimize her. I asked her questions.

THE COURT: The objection is overruled. It's argument.

MR. GAMBARDELLA: What has she been consistent about from day one, from within minutes, if not seconds of

this call, when she calls 9–1–1? [Appellant] is the killer. What does she tell police when they interviewed her, after she gets out of the hospital? [Appellant] is the killer. What does she say at the preliminary hearing under cross-examination? [Appellant] is the killer. What does she say when she comes in here to court and places her hand on the Bible and tells you, and has to relive this horrific incident? [Appellant] is the killer.... So she's a victim, she's an unimpeached witness, and I think this is the word [Miranda's counsel] used as well—let me use it again, she's a hero. She's a hero.

She did that motherly instinct to save a life ... she was willing to sacrifice her own life to save her son.... She was ready to sacrifice her own life to save that boy. Don't come into this courtroom and call her liar.... Don't come in here and call her a liar. The woman is a hero[.]

*Id.* at 109–111.

During later portions of his closing remarks to the jury, the prosecutor highlighted the consistencies between the testimonies of Carmona and Martinez with respect to Miranda's removal of the CD player and headphones, the attempts by Carmona and Diaz to separate Miranda and Thomas, and the order in which the trio fled from the apartment after the shootings. *Id.* at 122–123. The prosecutor also pointed out that Appellant's testimony diverged therefrom, as follows:

Now, [Appellant] disagrees with all that. He says, no, no, no, I didn't hear words exchanged. I was playing with my precious cell phone. No. No. No. I ran out afterwards, not [Miranda.] No. No. And he's the only one who disagrees with that.

Most importantly, [Appellant is] the only one that disagrees and say[s] Steven Miranda is the shooter. The only one. The only one, not only in this courtroom, but the only one in the universe that came into this courtroom to say that. The only one with a real interest, self interest, self-preservation interest to say that. The only one.

When you are looking at credibility ladies and gentlemen, you're going to look at who has an interest in the case. Who has an interest to lie? [Carmona] has no interest to lie. [Carmona] wants the killer, wants the shooter convicted. The person that she said seconds before, or seconds after the killing to the 9-1-1 operator, when asked who is the killer? Alfonso. His name is Alfonso. The person she said all along, and I don't have to go through each and every time[,] was the shooter. She wants justice.

[Martinez] has no interest to lie. . . . He implicated himself in a burglary and a conspiracy, and also a felony murder.

. . . .

Now he knows, once he's pled guilty, this is the Judge that's going to sentence him. He's not going to lie. He's not going to come up here and take the stand and lie. The only other person you've heard from about this incident was [Appellant]. He has the motive to lie, for self-preservation. And he lied again and again on the stand.

MR. McMAHON: Objection your Honor.

THE COURT: Overruled.

MR. McMAHON: It's not fair for counsel to say—

THE COURT: Overruled.

*Id.* at 127–130.

The prosecutor continued to highlight the points at which Appellant's testimony diverged from the testimony of the Commonwealth's witnesses, in relevant part, as follows:

So that brings us to two huge, huge, huge lies that [Appellant] told you under oath. One is that Steven Miranda is the gunman, and we know he's not. The second is that he cared about Lisa Diaz. He didn't think about Lisa Diaz growing older, maybe falling in love with someone. He didn't think about leaving [her] kids . . . mother-less when he's putting a bullet in her head. That's not how you care about somebody.

MR. McMAHON: Objection, your Honor.

THE COURT: The objection is overruled. It's argument.

MR. McMAHON: It's not that. Interaction with this defendant, that's improper.

THE COURT: Overruled. You may continue.

MR. GAMBARDELLA: Thank you. [Appellant] doesn't care about anything but himself. He doesn't care about the law. He doesn't care about the value of human life, and ladies and gentlemen, when he took this stand, he didn't care about the truth. He told lie after lie after lie to get himself out of this mess.

*Id.* at 132–133.

The prosecutor also commented, "Even as [Appellant] sits here today, there's no remorse." *Id.* at 121. Appellant's objection to the remark was sustained by the court. After the prosecutor's closing remarks had concluded, outside the hearing of the jury, the following exchange took place:

MR. McMAHON: Judge put on the record some objections to the prosecutor's closing. First objection is that the Commonwealth's attorney stood in front of my client, looked at him and said, he has no remorse.

THE COURT: I sustained the objection.

MR. McMAHON: I think cautionary instruction. Second of all, he went on over and over again and said he lied, he lied, over and over again. Two huge lies. Then he went off and said he told lie, after lie, after lie. My understanding of the law, a prosecutor cannot express his personal opinion as to whether a person is telling the truth or not telling the truth. To repeatedly say my client is a liar, liar, liar, to me is misconduct on the part of the prosecutor. To say that— you're not allowed to express personal opinion, he told lie after lie. He could argue that the defendant is not believable. He could argue all that stuff, but to repeatedly call him a liar, is not for the prosecutor.

THE COURT: He commented on the credibility of the defendant. It's a fair comment or appropriate argument, and I'll note that the record does not reflect him saying, in my opinion, he is a liar.

MR. McMAHON: I would have no objection to that.

THE COURT: He didn't interject his personal opinion.

*Id.* at 144–145.

The court did not issue a cautionary instruction to the jury regarding the prosecutor's comment on Appellant's lack of remorse.

The court then charged the jury, but declined to include a charge on the elements of voluntary manslaughter. With respect to voluntary intoxication, the court charged the jury as follows, to which charge Appellant offered no objection:

... [T]here was some testimony in this case about persons using intoxicants. Persons who may have been utilizing alcohol or narcotics or a combination of both. The only reason I tell you that is because voluntary intoxication or the use of drugs, individually or together, is not a defense to a criminal charge. It is not a defense. A person who voluntarily uses intoxicants, alcohol, or drugs, cannot become so intoxicated or drugged that he's legally incapable of committing the crime. So remember that is not a defense to any crime which is charged herein.

*Id.* at 167.

The jury returned guilty verdicts as to all charges on September 30, 2008, and the penalty phase was held on October 2, 2008. At the penalty phase proceedings, the parties waived opening statements. The Commonwealth incorporated all testimony and evidence from the guilt phase proceedings, republished several trial exhibits to the jury, then rested its case. Appellant presented the testimony of a number of witnesses, all of whom were friends and/or family of Appellant who had known him and interacted frequently with him since he was a boy. All of Appellant's witnesses testified that he had always been a kind, caring, respectful, loving, and non-violent person. Thereafter, Appellant rested and the parties presented their closing arguments.

The jury returned a sentence of life imprisonment for the first-degree murder of Mendez Thomas. It returned a sentence of death for the first-degree murder of Lisa Diaz. With respect to that killing, the jury unanimously found three

aggravating circumstances: that Appellant had committed the killing while in the perpetration of a felony (42 Pa.C.S. § 9711(d)(6)); that in the commission of the offense, Appellant had knowingly created a grave risk of death to another person in addition to the victim of the offense (42 Pa.C.S. § 9711(d)(7)); and that Appellant had been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue (42 Pa.C.S. § 9711(d)(11)). The jury also unanimously found four mitigating circumstances: that Appellant had no significant history of prior criminal convictions (42 Pa.C.S. § 9711(e)(1)); that Appellant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (42 Pa.C.S. § 9711(e)(3)); Appellant's age at the time of the crime[4] (42 Pa.C.S. § 9711(e)(4)); and other evidence of mitigation concerning Appellant's character and record and the circumstances of his offense (42 Pa.C.S. § 9711(e)(8)). The jury's sentence of death was based on its finding that the aggravating circumstances outweighed the mitigating circumstances. The court imposed the sentence of death on October 22, 2008.

**Post-trial**

Appellant did not file post-verdict motions or a direct appeal from the judgment of sentence. On November 24, 2009, a petition was filed on Appellant's behalf pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541, *et seq.*, by the Federal Community Defender Office ("FCDO") for the Eastern District of Pennsylvania, Capital Habeas Corpus Unit, Federal Court Division, Defender Association of Philadelphia, seeking reinstatement of Appellant's direct appeal rights *nunc pro tunc*. The PCRA court granted the petition and the FCDO filed a notice of appeal on December 29, 2009, along with a motion for the appointment of new counsel. The court declined to appoint new counsel, and on January 8, 2010, entered an order directing the FCDO to file a Rule 1925(b) concise statement of errors complained of on appeal within twenty-one days.

4. On the date of the murders, Appellant was 25 years of age.

On January 27, 2010, the FCDO filed a motion in the trial court to withdraw as counsel and to stay the Rule 1925(b) order, and renewed its motion for the appointment of new counsel and to permit Appellant to proceed in *forma pauperis.* On January 28, 2010, the FCDO filed essentially the same application with this Court, undersigned by Michael Wiseman, Esquire, in which it was averred that the FCDO is authorized and funded to represent state capital defendants in federal habeas corpus proceedings and, under certain limited circumstances, in state post-conviction proceedings, and that its *pro bono* representation of Appellant in the present matter was "under extraordinary circumstances," for the "sole and limited purpose of assisting [Appellant] to reinstate his direct appeal rights." Application, dated 1/28/10, at ¶ 1, ¶ 12. The application additionally averred that the FCDO's representation was designed "not only to protect [Appellant's] direct appeal rights, but also to protect [his] federal and state post-conviction rights against possible future challenge." *Id.* at ¶ 12. Counsel asked (1) to be relieved as counsel; (2) for the order directing counsel to file a Rule 1925(b) statement to be stayed; (3) for Appellant to be granted IFP status; and (4) for the appointment of new counsel to represent Appellant in his direct appeal from the judgment of sentence. *Id.* at ¶¶ 11–14.

On March 31, 2010, this Court entered the following *per curiam* Order:

AND NOW, this 31st day of March, 2010, upon consideration of the Application to Withdraw as Counsel, the request for a stay, and the request for designation of in forma pauperis ("IFP") status, the matter is remanded to the trial court. The trial court is ordered to rule promptly on counsel's January 27, 2010 Motion to Withdraw as well as appellant's Motions requesting IFP status and appointment of new counsel, which were filed on December 29, 2009, and renewed on January 27, 2010. In ruling on these motions, the trial court is directed to ascertain the basis for, and the legitimacy of, counsel's assertions that they are not authorized to continue as appellant's counsel in a direct appeal, as well as to consider Pa.R.P.C. 6.2 and Explanatory Comment

(relating to the appointment of counsel). Appellant's request to stay the trial court's Pa.R.A.P. 1925 order dated January 8, 2010, is DENIED without prejudice.

*Commonwealth v. Sanchez*, 605 Pa. 403, 989 A.2d 1290 (2010).

On remand, the trial court conducted a hearing, at the conclusion of which it appointed the Pennsylvania Capital Representation Project (a non-profit project of the FCDO) to represent Appellant, and granted counsel leave to file a Rule 1925(b) statement within 90 days. Billy H. Nolas, Esquire, entered his appearance for Appellant, and after seeking and receiving numerous extensions of time within which to file the concise statement, filed it on February 14, 2011. It was seventeen pages in length, and alleged thirty-three separate trial errors for appellate consideration.[5]

The trial court issued an initial thirty-eight-page Rule 1925(a) opinion, dated March 17, 2010, prior to the filing of the Rule 1925(b) statement, in which it determined that the evidence at trial had been sufficient to sustain the determinations of guilt of first-degree murder. The court subsequently issued a comprehensive, seventy-one-page supplemental Rule

---

5. On January 14, 2011, prior to filing the statement, the FCDO filed an application in the trial court for "Approval of Statement in Absence of Transcript and/or to Correct the Record under Pa.R.A.P. 1923 and/or 1926," which asserted that the trial transcripts were incomplete and did not reflect the preservation of certain issues. The application sought a hearing to "memorialize the contents" of all "off the record" discussions between counsel and the court that had taken place during trial. Further, the application contained the verified affidavit of Jack McMahon, Esquire, asserting that the transcript failed to reflect that before the jury was charged, he had requested an instruction on voluntary manslaughter, which request had been denied by the court. Moreover, the affidavit asserted that the record did not reflect that Appellant had been required to wear a "stun belt" throughout the trial, and that when Mr. McMahon inquired as to why such a device was necessary, he had been told it was court policy, and that no hearing or discussion had taken place as to whether the device was necessary in this particular case. On June 2, 2011, when no ruling on the January 14, 2011 Application had been issued, appellate counsel filed a motion for a ruling thereon, and listed seventeen separate instances in the transcript where off-the-record "side bar" discussions during trial had not been transcribed. The trial court never ruled on the applications to correct the record and/or approve a statement in absence of transcript.

1925(a) opinion, which dismissed the specific allegations of error raised in Appellant's Rule 1925(b) statement.

### Sufficiency of the evidence

 Although Appellant has not challenged the sufficiency of the evidence to sustain his first-degree murder conviction for the killing of Lisa Diaz, in all capital direct appeals, this Court conducts a sufficiency of the evidence review *sua sponte*. *Commonwealth v. Staton*, 614 Pa. 487, 38 A.3d 785, 789 (2012). In considering the sufficiency of the evidence for a first-degree murder conviction, this Court must ascertain whether the evidence introduced at trial and all reasonable inferences derived from that evidence, viewed in the light most favorable to the Commonwealth as verdict-winner, was sufficient to establish beyond a reasonable doubt all the elements of first-degree murder. *Id.* Our standard of review is *de novo* and our scope of review is plenary. *Id.*

 First-degree murder is an intentional killing, *i.e.*, a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a), (d). In order to prove first-degree murder, the Commonwealth must establish that: (1) a human being was killed; (2) the accused caused the death; and (3) the accused acted with malice and the specific intent to kill. *Staton, supra* at 789. The jury may infer the intent to kill based upon the defendant's use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Johnson*, 604 Pa. 176, 985 A.2d 915, 920 (2009) (citing *Commonwealth v. Baumhammers*, 599 Pa. 1, 960 A.2d 59, 68 (2008)). In reviewing whether the evidence was sufficient to support a first-degree murder conviction or convictions, the entire trial record must be evaluated and all evidence considered. *Id.* In applying the above standards, we bear in mind that the Commonwealth may sustain its burden by means of wholly circumstantial evidence, and "the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence." *Commonwealth v. Cousar*, 593 Pa. 204, 928 A.2d 1025, 1032–1033 (2007).

At trial and as recounted *supra*, the Commonwealth presented uncontested forensic evidence that Diaz had been shot in the head at close range. The Commonwealth also presented eyewitness testimony that Appellant had been the shooter. Although Appellant testified that his co-defendant Miranda had been the shooter, the jury was free to discount that testimony and to credit the testimony of the witnesses who positively identified Appellant as the gunman. Accordingly, we hold that sufficient evidence was presented to permit the jury to properly conclude that Appellant was guilty of the first-degree murder of Diaz beyond a reasonable doubt.[6] Having determined that the evidence was sufficient to sustain Appellant's capital murder conviction, we proceed now to discuss Appellant's failure to preserve certain issues, and the resulting waiver of several claims he has attempted to raise on appeal.

**Waiver**

In its supplemental Rule 1925(a) Opinion, the trial court reached the merits of all the claims of error raised by Appellant. The Commonwealth now asserts that a number of the claims raised on appeal have been waived by Appellant's failure to preserve them below. In response, Appellant claims generally that the trial record is incomplete, and thus, in the event this Court determines that any claim of trial court error has been waived due to a failure to offer a contemporaneous objection at trial, asserts that remand is warranted for the creation of a full record which might show that the issue had, in fact, been preserved. In concert with this response, Appellant also raises, as a separate issue, the claim that his constitutional rights have been violated due to "the absence of a record of significant portion[s] of the trial court proceedings." Appellant's Brief at 70.

6. We have conducted *sua sponte* review of the sufficiency of the evidence only as to the capital first-degree murder verdict and not with regard to the related first-degree murder verdict for the killing of Thomas that resulted in a sentence of life imprisonment. *See Commonwealth v. Sanchez*, 614 Pa. 1, 36 A.3d 24, 27 (2011) (setting forth that this Court conducts *sua sponte* sufficiency review only as to capital first-degree murder verdicts and not with regard to related convictions).

Appellant argues that there were seventeen instances during trial in which sidebar conferences were conducted off-the-record, and maintains that conducting off-the-record sidebar conferences amounted to trial court error warranting a new trial, or in the alternative, a remand "to the trial court to develop a full record." *Id.* at 71. Appellant describes three of the seventeen non-transcribed sidebars as having occurred during "critical" testimony. *Id.* Appellant does not, however, proffer any specific complaint or argument regarding the substance of any of these sidebars, but simply claims their transcription is "crucial" to any reasonable review of the propriety of the proceedings. *Id.* at 72. Appellant argues that he "need not articulate the specific claims of error that would be revealed" had the sidebars been transcribed. *Id.* at 74. Instead, he posits that the trial court's failure to ensure that all sidebars were transcribed denied Appellant his constitutional rights to counsel and due process and the right to meaningful appellate review, because without a transcript of what transpired during unrecorded sidebars, he has been prevented from identifying errors "that might have occurred below." *Id.* Appellant additionally argues that the lack of transcribed sidebars cripples this Court's ability to independently review his sentence of death, and thus, that the absence of transcription of "the entire proceedings" deprives him of his right to our independent review of his sentencing to determine whether the verdict was arbitrary. *Id.* at 73–74.

The Commonwealth argues that this claim of error is itself waived, because Appellant "did not make any objections to these sidebar discussions or place [on the] record any objections to the content of the discussions, and did not attempt to place the substance of these discussions on the record." Commonwealth's Brief at 69. We have reviewed the entire trial record, and it is clear that counsel never objected at trial to any off-the-record conferences or side-bar discussions. Accordingly, we determine that Appellant's claim is waived. *See Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385, 402 (2003) (abrogating this Court's capital direct appeal relaxed waiver rule and holding, "[A]s a general rule on capital direct

appeals, claims that [a]re not raised and preserved in the trial court are waived and unreviewable. Such claims may be pursued under the PCRA, as claims sounding in trial counsel's ineffectiveness or, if applicable, a statutory exception to the PCRA's waiver provision.")

In a related claim focusing on this Court's obligation to conduct an independent review, Appellant has identified four circumstances that occurred during trial that allegedly reveal his sentence of death to be the product of passion, prejudice and arbitrary factors: 1) the trial court's alleged failure to "life qualify" the jury; 2) the Commonwealth's alleged inappropriate bolstering of Carmona's testimony; 3) the alleged improper admission of evidence of Appellant's prior crimes and bad acts; and 4) the behavior of detectives during Appellant's direct testimony. The Commonwealth responds that sub-issues one and two are waived because Appellant offered no contemporaneous objections during trial; that sub-issue three is waived because Appellant conceded at trial that the challenged evidence was admissible; and that sub-issue four is waived because Appellant did not request a mistrial or a cautionary instruction or ask the trial court to question the jurors regarding whether they had observed the detectives' behavior. We agree.

This Court has explained that "life qualification" is the process by which prospective jurors who hold a fixed opinion that a sentence of death must be imposed for a first-degree murder conviction are excluded from the jury. *Commonwealth v. Speight,* 578 Pa. 520, 854 A.2d 450, 459 (2004). Although a defendant on trial for a capital offense who requests to life qualify a jury must be permitted to do so, there is no constitutional mandate that *voir dire* include this line of questioning unless requested. *Id.* Appellant complains that although "every single juror in this case was asked whether he or she could impose the death penalty, only five of the twelve jurors were asked if they could impose a sentence of life where it was appropriate under the law." *Id.* at 78, 854 A.2d 450. Appellant argues that due to this allegedly incomplete *voir dire,* "the trial court was unable to fulfill its responsibility

to ensure that the jury was composed only of jurors who could be impartial," such that Appellant "was sentenced to death by a jury that was 'uncommonly willing to condemn a man to die.'" *Id.* at 78–79, 854 A.2d 450 (citing *Witherspoon v. Illinois*, 391 U.S. 510, 521, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)). However, the record is clear that Appellant neither requested that the jury be "life qualified," nor made any contemporaneous objection regarding the alleged lack of "life-qualification;" thus, this claim of error is waived. *Freeman, supra;* Pa.R.A.P. 302(a) (issues not raised in the lower court are waived and cannot be raised for the first time on appeal).

 Similarly, Appellant's claim that the prosecutor improperly bolstered Carmona's testimony is waived.[7] We have carefully reviewed the record, and the objection posed by Appellant during the prosecutor's argument to the jury regarding Carmona's trial testimony was not offered on the basis of improper bolstering, but on the basis that the prosecutor had improperly suggested that Carmona had been "victimized" by defense counsel's attempts to discredit her. This Court has long held that to preserve for appellate review an objection relating to the opening or closing address of opposing counsel, the objection must be specific and brought to the trial judge's attention as soon as is practical. *Commonwealth v. Sanabria*, 478 Pa. 22, 385 A.2d 1292, 1296 (1978); *Commonwealth v. Richardson*, 476 Pa. 571, 383 A.2d 510, 519 (1978). Here, Appellant did not lodge an objection for alleged improp-

7. Appellant claims that, during the guilt phase, there were numerous instances during the prosecutor's closing remarks in which he improperly portrayed Carmona as a victim and a hero, thereby improperly "bolstering" her testimony by allegedly encouraging the jury to "render a verdict based on sympathy for the witness rather than the guilt or innocence of the accused." Appellant's Brief at 79–81. Appellant additionally alleges that the improper bolstering during the guilt phase invited the jury to disregard the mitigating circumstances presented by Appellant during the penalty phase "out of passion and sympathy for Carmona." *Id.* at 82. This Court has stated that "[i]mproper bolstering or vouching for a government witness occurs where the prosecutor assures the jury that the witness is credible, and such assurance is based on either the prosecutor's personal knowledge or other information not contained in the record." *Commonwealth v. Smith*, 606 Pa. 127, 995 A.2d 1143, 1157 (2010) (*citing Cousar, supra* at 1041).

erly bolstering by the prosecutor at trial, only raising that basis for objection for the first time on appeal. Thus, it is waived. *Freeman, supra; Sanabria, supra; Richardson, supra;* Pa.R.A.P. 302(a).

 Appellant further complains that the court erred in admitting into evidence two photos of newspaper clippings identifying Appellant as wanted and characterizing him as armed and dangerous, and for publishing the photos to the jury. Appellant claims that the evidence was hearsay and that its prejudicial effect outweighed its probative value. We conclude that this issue is waived because counsel expressly conceded the admissibility of the photos at trial, and counsel's objection to the proposed publication to the jury of the photo that included the sub-headline "two were killed over drug debt," was sustained and that particular photo was not published.[8]

8. The following discussion was held at sidebar during trial:

> THE COURT: We are at sidebar out of the hearing of the jury.... [T]here's an issue concerning the publication of photographs that were just offered into evidence, and there's an objection by the defense. Mr. McMahon, I'll hear you.
> MR. McMAHON: Thank you, Your Honor. Preliminarily, I have no objection to, and I don't, that these ... items were found, these articles were about the killing, two different articles reflecting that he was wanted, and I think the purpose of those articles show his awareness of the fact that they were looking for him and his failure to turn himself in would be consciousness of guilt. I understand the purpose of it, and agree that's relevant.
> But the portions in there regarding "killed over drug debt," is not relevant to anything that the Commonwealth is attempting to show as far as consciousness of guilt.
> Let me see what the other one says. "Authorities Vow To Find Shooter." I have no problem with that because that would be consciousness of guilt because they are trying to find him. I agree with that one. I have no problem with that.
> When they editorialize and put in there that it was a kill[ing] over a drug debt, there's no evidence of that at this point in the case. I think the Commonwealth can accomplish what they wish to accomplish by, A, presenting [*i.e.*, publishing] Commonwealth exhibit 83 ["Authorities Vow To Find Shooter" article], and B, indicating that there was another paper, a different paper saying that he was wanted without publishing the kill over debt portion of it. I believe the probative value can be fully presented without that prejudicial statement. I don't think the Commonwealth is hurt in any way in their

 Appellant additionally claims that during his direct testimony about the events immediately preceding the shooting, several detectives "sitting at the table for the Commonwealth ... laughed, smiled, and rolled their eyes[.]" Appellant's Brief at 86. Defense counsel then asked the court to conduct a side-bar conference, during which counsel described the behavior and asked the court to remove the detectives. The court stated that it had a view of the entire courtroom and did not see the behavior complained of. Counsel for Miranda also stated that he did not see the behavior; however, co-counsel for Miranda stated that he had seen "smiling" only. The Court then instructed the prosecutor to inform the detectives to remain "stoic." N.T. Trial, 9/26/08, at 56–57, *see supra* at 17–18. Defense counsel did not ask for a curative instruction or request a mistrial.

Appellant now claims that the trial court erred because it did not question the jurors as to whether they had witnessed the conduct, and because it did not instruct the jury to ignore the behavior. Neither remedy was requested at trial; thus the Commonwealth asserts that the issue is waived. We agree. *See Commonwealth v. Johnson,* 615 Pa. 354, 42 A.3d 1017, 1026 (2012) ("Appellant also faults the trial court for failing to give a contemporaneous limiting instruction. Insofar as appellant complains about the lack of a contemporaneous instruction, he waived this claim by failing to request a curative instruction.") (citing Pa.R.A.P. 302(a)).

 In the face of these waivers, Appellant responds that "claims that were not preserved by trial counsel yet still establish that the sentence was the result of passion, prejudice or other arbitrary factors are cognizable and may be reviewed by this Court on direct appeal, at least where those issues are clear and do not implicate possible reasonable trial strategies." Appellant's Reply Brief at 7. In so arguing, Appellant urges us to reconsider our decisions in *Commonwealth v. Chambers,* 602 Pa. 224, 980 A.2d 35 (2009), and *Commonwealth v. May,*

attempt to prove his consciousness of guilt in that the police wanted him.

N.T. Trial, 9/24/08, at 15–16. Thereafter, the record reflects that only Exhibit 83 was published to the jury.

612 Pa. 505, 31 A.3d 668 (2011), decisions which are directly to the contrary. This we decline to do. We have determined that statutory penalty review does not operate to preserve waived claims. *See Commonwealth v. VanDivner*, 603 Pa. 318, 983 A.2d 1199, 1205 (2009) (holding in the context of a reargument petition that, "Merely labeling a waived claim as one implicating the [statutory penalty review] standard, as appellant does, does not make it so.") Accordingly, we determine that Appellant's waived claims of error cannot be salvaged simply by presenting them as allegedly implicating this Court's statutory review.

Finally, the Commonwealth asserts that Appellant has waived the claim in which he asserts entitlement to a new trial and sentencing because he was forced to wear a stun belt during trial, allegedly in violation of his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 9 and 16 of the Pennsylvania Constitution. Appellant does not provide this Court with any specific description of the apparatus he was required to wear, but we recognize that a "stun belt" is a restraint device that can potentially deliver a jolt of electricity by remote control. Appellant offers no relevant information as to the size, location, visibility, or precise manner of operation of the device he was required to wear, or the potency of its presumed disabling effect if activated.

Despite the trial court's description of the device as an "ankle bracelet" that was "not visible to the jury," see Trial Court Opinion, dated 4/26/11, at 65, Appellant maintains, among other things, that the "record is silent" as to whether the device was visible to the jury. Appellant's Brief at 41. Appellant claims, without any support or elaboration, that "the stun belt, whether visible to jurors or not, affected their impression of Appellant during his testimony." *Id.* He complains further that being forced to wear the device hindered him physically and psychologically from fully participating in his trial, and that he was entitled to a hearing to determine whether the device was necessary. Appellant argues that his "rights to a presumption of innocence, counsel, fair trial, due

process, to participate in his own defense, to testify, and to be free of cruel and unusual punishment were violated" because he was required to wear the device without a hearing as to its necessity. *Id.* at 41. Importantly, Appellant concedes that counsel did not object to the use of the device or request a hearing to determine the necessity of the device, but argues that the court, "as the gatekeeper of the constitution," was required to conduct the inquiry *sua sponte* in order to protect Appellant's rights, and that the court's failure to make the inquiry "was an error of constitutional magnitude."[9] *Id.* at 47. Whatever the potential merit of Appellant's alleged claim of error, it is clear the claim is waived for failure to pose a contemporaneous objection at trial. *Freeman, supra; Sanabria, supra; Richardson, supra;* Pa.R.A.P. 302(a). Having established that Appellant's above claims are waived, we proceed now to examine Appellant's remaining issues.[10]

**I. The evidence was constitutionally insufficient to sustain Appellant's convictions for the crimes of burglary and conspiracy to commit burglary, and insufficient to sustain the jury's finding of the aggravating circumstance set forth in 42 Pa.C.S. § 9711(d)(6), where the felony alleged was burglary; Appellant's convictions for burglary, and conspiracy to commit burglary, as well as his death sentence, must be vacated.**

Appellant's Brief at 31.

 Appellant asserts that the evidence at trial was insufficient to sustain his conviction for burglary and conspiracy to

**9.** In support of this novel proposition, Appellant cites to cases generally standing for the proposition that a court is required to conduct an on-the-record colloquy when a defendant wishes to waive the right to a jury, or to present mitigating circumstances, or to enter a guilty plea. None of the cases cited by Appellant discuss stun belts or any other restraints.

**10.** We have renumbered Appellant's remaining issues for ease of discussion. We note that the Commonwealth has not pursued waiver or presented a default argument in the face of several claims that were also not brought to the trial court in a timely manner, to wit, Appellant's remaining issues two and seven. However, as the Commonwealth has "waived the waiver" in these instances, we will proceed to a merits disposition of those claims because we see substantive review as the most efficient manner of resolving the questions raised.

commit burglary because the Commonwealth failed to prove beyond a reasonable doubt that he was not licensed or privileged to enter the premises, and additionally because the Commonwealth failed to prove that he had agreed with anyone to enter the premises with the intent to commit an assault therein. Appellant's contention in this regard is the linchpin of his argument that the jury improperly considered, as an aggravating circumstance, that the killing had taken place during the commission of a felony, and thus, that he is entitled to a new penalty phase hearing.

We reiterate that when reviewing a challenge to the sufficiency of the evidence, we must determine whether the evidence admitted at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict-winner, supports all of the elements of the offense beyond a reasonable doubt. *Commonwealth v. Cooper*, 596 Pa. 119, 941 A.2d 655, 662 (2007) (*citing Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 840 (2003)). In making this determination, we consider both direct and circumstantial evidence, cognizant that circumstantial evidence alone can be sufficient to prove every element of an offense. *Id.* (*citing Commonwealth v. Gorby*, 527 Pa. 98, 588 A.2d 902, 906 (1991)). We may not substitute our own judgment for the jury's, as it is the fact-finder's province to weigh the evidence, determine the credibility of witnesses, and believe all, part, or none of the evidence submitted. *Id.* (*citing Commonwealth v. Hawkins*, 549 Pa. 352, 701 A.2d 492, 501 (1997)).

"A person is guilty of burglary if he enters a building or occupied structure, or separately secured or occupied portion thereof, with intent to commit a crime therein, unless the premises are at the time open to the public or the actor is licensed or privileged to enter." 18 Pa.C.S. § 3502(a). Thus, to prevail on a burglary charge, the Commonwealth is required to prove beyond a reasonable doubt that the offender entered the premises with the contemporaneous intent of committing a crime therein, at a time when he or she was not licensed or privileged to enter. *Cooper, supra* at 666 (*citing Commonwealth v. Thomas*, 522 Pa. 256, 561 A.2d 699, 704

(1989)). Any license or privilege to enter a premises is negated when it is acquired by deception. *Id.* (*citing Commonwealth v. Edwards,* 588 Pa. 151, 903 A.2d 1139, 1148 (2006) (holding that a defendant who had entered the home of his murder victims under the pretense that he was going to pay them for drugs he had stolen, entered the premises by means of deception which negated any purported license or privilege to enter; thus, the evidence was sufficient to sustain the defendant's burglary conviction)).

 To sustain a criminal conspiracy conviction, the Commonwealth must establish that a defendant entered into an agreement to commit or aid in an unlawful act with another person or persons, with a shared criminal intent, and an overt act was done in the conspiracy's furtherance. 18 Pa.C.S. § 903; *Commonwealth v. Weimer,* 602 Pa. 33, 977 A.2d 1103, 1105–1106 (2009). The overt act need not accomplish the crime-it need only be in furtherance thereof. *Id.* at 1106. In fact, no crime at all need be accomplished for the conspiracy to be committed. *Id.* In most cases of conspiracy, it is difficult to prove an explicit or formal agreement; hence, the agreement is generally established via circumstantial evidence, such as by "the relations, conduct, or circumstances of the parties or overt acts on the part of co-conspirators." *Johnson, supra* at 920.

Here, viewing the evidence and all the inferences derived therefrom in the light most favorable to the Commonwealth, we have little difficulty in determining that the evidence was sufficient for the jury to reasonably conclude that Appellant entered the victims' apartment through deception, with the intent, shared with Miranda and Martinez, to commit a crime therein. With respect to any possible license to enter, the jury heard uncontroverted testimony that Appellant had never been inside the victims' apartment before the night in question. Moreover, Carmona testified that, in her opinion, the shootings had been a "set up," because only Miranda had known where she and Thomas resided, and Miranda had not disclosed that Appellant would be coming with him. From this evidence, the jury could have reasonably inferred that had

Carmona, Thomas or Diaz known that Appellant was with Miranda, they would have denied the trio entry. Moreover, even if the victims had been aware that Appellant was with Miranda and knowingly permitted Appellant and Miranda entry to conduct a marijuana transaction, Martinez testified that obtaining marijuana had been a ruse. With additional regard to deception, during Miranda's call to Thomas, ostensibly to arrange a meeting to procure marijuana, Appellant took the phone and attempted to disguise his voice. With regard to intent to commit a crime, Appellant urged Miranda that, once they were inside the apartment, Miranda should prove himself to Appellant and should not simply "bullshit," but should vigorously "fight." Moreover, Martinez was to be Miranda's "backup" and would provide assistance in the "fight" if necessary.

Additionally, the trial evidence established all of the following facts. The trio took a circuitous route through back roads to arrive at the apartment complex, and then Appellant parked in a remote spot on a side street, not in the parking lot of the complex. Standing outside the apartment door, Appellant took a position to the side, so as to be shielded from view. Diaz opened the door to her boyfriend Miranda, and greeted him and Martinez in a friendly fashion, but became immediately frightened when Appellant entered. When Thomas and Carmona arrived, Appellant gave Carmona a threatening look and asked "do you remember me?" Within two minutes of the arrival of Thomas and Carmona, a physical and verbal confrontation took place between Appellant and Thomas, during which Appellant pushed Thomas toward Miranda. Diaz and Carmona stepped between Appellant and Thomas in an attempt to calm the situation, after which Appellant drew a gun and began shooting. Martinez and Appellant became separated from Miranda while fleeing immediately after the shootings, but the trio rendezvoused shortly thereafter in Philadelphia.

From this evidence, the jury could reasonably have concluded that all the elements of burglary and conspiracy to commit burglary had been established beyond a reasonable doubt. In other words, from the trial evidence, the jury could have

reasonably concluded that by acting in concert pursuant to an agreed-upon plan, Martinez and Miranda helped Appellant gain unprivileged entry into the premises, by deception, with the shared intent to commit a crime therein.

Because the evidence was sufficient to convict Appellant of burglary during the guilt phase of the trial, it was not improper for the jury to consider as an aggravating circumstance during the penalty phase that Appellant had committed the killing "while in the perpetration of a felony" pursuant to 42 Pa.C.S. § 9711(d)(6). The term "perpetration of a felony" is defined, in relevant part, as "engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit ... burglary[.]" 18 Pa.C.S. § 2502(d).[11] Accordingly, Appellant is entitled to no relief on this claim of error.

**II. Whether the evidence presented was constitutionally insufficient to sustain Appellant's individual and multiple convictions for conspiracy, including conspiracy to commit criminal homicide, burglary, aggravated assault and possession of an instrument of crime?**

Appellant's Brief at 37.

 We have determined, *supra*, that the evidence at trial was sufficient to sustain Appellant's conviction for conspiracy

---

11. We do not here suggest that the "in perpetration of a felony" aggravating circumstance, 42 Pa.C.S. § 9711(d)(6), should be limited to the six felonies enumerated in the definition of "perpetration of a felony" at 18 Pa.C.S. § 2502(d), or, in other words, that a jury is limited to considering only the six felonies enumerated in Section 2502(d) as aggravating factors in determining whether to impose the death penalty. In *Commonwealth v. Robinson*, 583 Pa. 358, 877 A.2d 433 (2005), the jury found the appellant guilty of, among other things, attempted criminal homicide, aggravated assault, and concealing a firearm. This Court determined that the jury could properly consider these felony offenses for purposes of Section 9711(d)(6), because felonies in Pennsylvania are those offenses contained in the Crimes Code at 18 Pa.C.S. § 101 *et seq. Id.* at 445–446 (*citing Commonwealth v. Walker*, 540 Pa. 80, 656 A.2d 90, 102 (1995) (a jury is not limited to considering felonies enumerated in Section 2502(d), but may consider criminal trespass as a felony for purposes of determining aggravating circumstances under Section 9711(d)(6)). Here, in addition to burglary, which is an enumerated offense under Section 2502(d), the jury also convicted Appellant of numerous other felony offenses which it could properly have considered in determining aggravating circumstances.

to commit burglary. Appellant additionally claims that the evidence introduced during the guilt phase was insufficient to sustain his convictions for conspiracy to commit criminal homicide, conspiracy to commit aggravated assault, and conspiracy to commit possession of an instrument of crime. Appellant acknowledges that the court imposed no sentence for any of his conspiracy convictions, but argues that he "was nonetheless prejudiced by these multiple convictions ... [because] ... at his capital sentencing proceeding, the jury was left with the impression that Appellant had committed these multiple crimes, thus enhancing the seriousness of his offenses and lending greater weight in favor of the sentence of death." *Id.* at 40. Appellant continues, "The jury was under the false impression that Appellant was guilty of far greater crimes, surely tipping the scales improperly towards aggravation." *Id.*

The gravamen of Appellant's claim is that under Section 903(c) of the Crimes Code, he could only be found guilty of a single conspiracy offense.[12] Appellant insists that the evidence at trial was insufficient to prove his guilt of any conspiracy to commit any offense, but that, in no event, on the evidence presented, could he have been properly convicted of more than one count of conspiracy, and that his conviction of multiple counts prejudiced the jury against him in the penalty phase proceedings.

We disagree. In *Commonwealth v. Andrews*, 564 Pa. 321, 768 A.2d 309 (2001), this Court recognized that most conspiracy cases involve problems of proof with respect to the scope of the conspiracy, and that "absent evidence respecting the scope of an agreement," the issue of whether more than one conspiracy existed "may be decided by the alternate test under Section 903(c), namely, whether the [multiple crimes] resulted from a 'continuous conspiratorial relationship.'" *Id.* at 316 (*quoting* 18 Pa.C.S. § 903(c)). "By its terms, Section

12. The relevant provision states that "if a person conspires to commit a number of crimes, he is guilty of only one conspiracy as long as such multiple crimes are the object of the same agreement or continuous conspiratorial relationship." 18 Pa.C.S. § 903(c).

903(c) implicates a factual assessment of either the conspiratorial agreement or the relationship of the conspirators." *Id.* at 315 (*citing Commonwealth v. Koehler,* 558 Pa. 334, 737 A.2d 225, 245 (1999)). Whether multiple conspiracies exist is a factual issue that should be submitted to the jury in the first instance together with an appropriate instruction. *Id.* Here, there is no evidence in the record reflecting that Appellant requested a "single conspiracy" instruction based on evidence which might have tended to show the existence of one continuous conspiratorial relationship among all the conspirators or one broad conspiratorial agreement encompassing more than one crime, and the trial court gave none. Nonetheless, in claims of this type, our obligation is to determine whether there was sufficient evidence to support a finding of guilt as to multiple conspiracies, and we view the evidence in the light most favorable to Commonwealth as verdict-winner. *Id.*

As previously explained, there was evidence presented at trial regarding the scope of the conspiratorial agreement with respect to the burglary; to wit, the testimony of co-conspirator Martinez, from which the jury could have reasonably concluded that the agreement between Appellant and Martinez was limited to gaining unlawful entry into the premises with the intent to commit an assault therein. At trial, the jury learned that in exchange for the Commonwealth's agreement to withdraw the remaining charges against Martinez, he had pled guilty to burglary and conspiracy to commit burglary, was awaiting sentencing on those charges, and had agreed to testify for the Commonwealth. Martinez affirmatively testified that the crime the trio had intended to commit inside Thomas's and Carmona's apartment was an assault. Although the court gave the jury a "corrupt and polluted source" instruction with respect to his testimony, the jury nonetheless could have properly and reasonably concluded that the conspiratorial agreement, so far as Martinez knew and expected to be involved in with his co-conspirators, was limited in scope to a burglary for the purpose of committing an assault.

Martinez also testified that the agreement had been made shortly after Appellant and Miranda had met privately with

Angel Rodriguez for some twenty minutes while Martinez watched television in an adjacent room, when Appellant suggested "out of the blue" that Miranda "call that person you been having problems with, [Thomas]." N.T. Trial, 9/24/08, at 110. Given the events that transpired before and after that private meeting, as reflected by the evidence at trial, the jury could have reasonably concluded that in addition to forming a limited agreement with Martinez (to aid Appellant's deceptive entry into the premises), Appellant had formed a separate and additional conspiracy with Miranda to take a gun into the apartment and to fire the weapon at Thomas in the presence of the other occupants of the apartment.

Indeed, evidence was presented that after Appellant's and Miranda's private meeting with Rodriguez, it was Miranda who directed Appellant to take a circuitous route to the apartment and to park in a remote area. There was evidence that Miranda attempted to distance himself from the circumstances of the entry into the apartment by telling Martinez to lie to police about who had made the call to Thomas. There was also evidence that it was Miranda who, the day after the killing, had expressed concern that a bullet may have been left at the location where he had parked Appellant's vehicle. We determine that the circumstantial evidence was sufficient for the jury to convict Appellant of conspiracy to commit criminal homicide, conspiracy to commit aggravated assault, and conspiracy to possess an instrument of crime on the basis that those crimes arose from discrete conspiratorial agreements between Appellant and Miranda, separate from the one in which Martinez was Appellant's criminal partner and coconspirator.

Moreover, we disagree that the multiple conspiracy convictions could have unfairly prejudiced Appellant in the eyes of the jury during the penalty phase proceedings. During those proceedings, the Commonwealth did nothing to highlight in any way Appellant's multiple conspiracy convictions. Indeed, the Commonwealth's evidence at the penalty phase consisted of incorporating the evidence produced at the guilt phase proceedings, republishing several trial exhibits to the jury,

and conducting brief cross-examination of Appellant's witnesses. The Commonwealth did not even mention Appellant's conspiracy convictions during its closing argument at the penalty phase proceedings. Accordingly, we determine that Appellant is entitled to no relief on this claim of error.

**III. The court's incorrect instructions to the jury on voluntary intoxication deprived Appellant of due process and the right to have the jury consider relevant and admissible evidence regarding his state of mind.**

Appellant's Brief at 48.

 Appellant did not pursue an intoxication defense at trial, and the court instructed the jury that voluntary intoxication was not a defense to the crimes charged. Despite presenting an innocence defense at trial and pursuing a strategy that denied any criminal liability, Appellant now maintains that he was entitled to a jury instruction that evidence of intoxication may be relevant to reduce a murder defendant's potential culpability from first-degree murder to third-degree murder if a jury determines that the defendant's level of intoxication was so great that it rendered him or her unable to form the specific intent to kill. *Id.* at 48–49. Appellant grounds his argument on the fact that substantial evidence was adduced at trial that he had consumed large amounts of alcohol and marijuana close in time to the crimes charged. *Id.*

The Commonwealth responds that a voluntary intoxication instruction was not justified because Appellant did not admit to committing the killings in a drunken (or any other) condition, but instead pursued a defense of innocence. The Commonwealth also asserts that the claim is waived because counsel neither requested a voluntary intoxication instruction nor objected to its omission or to the jury charge as a whole as it was actually given.[13]

13. This is another instance where Appellant notes that some portions of the trial proceedings were not transcribed, and argues that because the trial court never ruled on Appellant's Motion for Statement in Absence of Transcript or Correction of the Record, "should this Court find that the record is silent as to whether trial counsel preserved any of the issues for appeal, the matter should be remanded for reconstruction of

310

 The defense of diminished capacity, whether grounded in mental defect or voluntary intoxication, is an extremely limited defense available only to defendants who admit criminal liability but contest the degree of culpability based upon an inability to formulate the specific intent to kill. *Commonwealth v. Hutchinson*, 611 Pa. 280, 25 A.3d 277, 312 (2011). "If a defendant does not admit that he killed the victim, but rather advances an innocence defense, then evidence on diminished capacity is inadmissible." *Id.* (*citing Commonwealth v. Laird*, 605 Pa. 137, 988 A.2d 618, 632 (2010)).[14]

 Where a defendant admits to committing a killing, in order to be entitled to a voluntary intoxication instruction, there must be some evidence that the defendant was overwhelmed or overpowered by alcohol or drugs to the point of losing his or her faculties or sensibilities. *Commonwealth v. Galvin*, 603 Pa. 625, 985 A.2d 783, 798 (2009) (*citing Commonwealth v. Tilley*, 528 Pa. 125, 595 A.2d 575, 580 (1991)). Mere evidence of the consumption of alcohol or drugs and an appearance of intoxication is not sufficient to support a conclusion that a defendant was overwhelmed or overpowered to the point of being incapable of forming the requisite specific intent to kill. *Id.*

 It is clear here that Appellant's sole defense at trial was that of innocence. His strategy was to present facts from which the jury might have concluded that it was Miranda who

the record, specifically any off-the-record sidebars or conferences." Appellant's Reply Brief at 2.

**14.** While some members of this Court have indicated a willingness to reconsider the restrictions upon alternative defenses where arguments based on the theoretical underpinnings are advanced, *see Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1132 n. 17 (2008); *Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1255 (2006) (Saylor, J., concurring and dissenting), the prevailing view of this Court is that a diminished capacity defense to first-degree murder is only available to defendants who admit that they killed the victim, but contest the degree of guilt based on an alleged inability, at the time of the offense, to formulate a specific intent to kill due to a mental defect or voluntary intoxication. *Commonwealth v. King*, 618 Pa. 405, 57 A.3d 607, 622 (2012) (*citing Hutchinson, supra*).

had killed the victims and that Appellant had simply been an innocent witness to murder. There was apparently no room in that defense for inclusion of a claim of voluntary intoxication, and Appellant apparently did not make such a claim—then. But even if he did request a voluntary intoxication instruction, he clearly did not object to the charge as actually given.[15] It is a bedrock appellate principle that "issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a); *Baumhammers, supra* at 73, 960 A.2d 59. "A general exception to the charge to the jury will not preserve an issue for appeal. Specific exception shall be taken to the language or omission complained of." Pa. R.A.P. 302(b). Additionally, this Court has held that, in the criminal trial context, the mere submission and subsequent denial of proposed points for charge that are inconsistent with or omitted from the instructions actually given will not suffice to preserve an issue, absent a specific objection or exception to the charge or the trial court's ruling respecting the points. *Commonwealth v. Pressley*, 584 Pa. 624, 887 A.2d 220, 225 (2005).

We are satisfied that the record is not silent, as Appellant suggests, but instead accurately reflects that no specific objection was made to the jury charge as given with respect to voluntary intoxication. This Court abolished the relaxed waiver doctrine in capital direct appeals filed after the date of our decision in *Commonwealth v. Freeman, supra.* Accordingly, the instant claim is waived and may be considered, if at all, only as a challenge to trial counsel's stewardship in a subsequent collateral appeal, if any. *See Commonwealth v. Moore*, 594 Pa. 619, 937 A.2d 1062, 1066 (2007) (*citing Commonwealth v. Uderra*, 580 Pa. 492, 862 A.2d 74, 79 (2004)).

15. We note that although the charging conference between the court and counsel was apparently conducted without a court reporter present, the record clearly reflects that Appellant made no objection during or after the actual charge to the jury with respect to voluntary intoxication. When queried by the court whether its instructions were sufficient "as to those I've agreed to instruct," which included the instruction that voluntary intoxication is not a defense, counsel answered in the affirmative. N.T. Trial, 9/22/08, at 225.

**IV. The court erred by denying counsel's request for an instruction on the lesser included offense of voluntary manslaughter.**

Appellant's Brief at 53, 55, 58.

We note initially that the Commonwealth contends that this issue is waived as well because the record does not indicate that any request for a voluntary manslaughter instruction was made, or that a specific and timely objection was made to the court's denial of such instruction. Appellant maintains that there was no waiver and reiterates that a remand to the trial court is necessary to dispose of his motion to correct or reconstruct the record if this Court should determine that the record is silent as to whether the issue has been preserved for appellate review.

Unlike Appellant's immediately previous issue in which our determination of waiver is straightforward because the record is clear that no objection had been interposed, our consideration of the Commonwealth's suggestion of waiver with respect to this claim of error is clouded by the fact that the charging conference between the court and counsel was not transcribed. Complicating our consideration of possible waiver is the trial court's merits disposition of the issue in its supplemental Rule 1925(a) opinion, an opinion filed after Appellant had filed his Motion for Statement in Absence of Transcript or Correction of the Record wherein Appellant specifically asserted that preservation of this particular issue had occurred during the charging conference. Under these circumstances, the trial court's treatment of the issue on the merits in its 1925(a) opinion sufficiently indicates to us its *sub silentio* determination that it deemed the record corrected to reflect that the issue had been properly preserved during the conference; *i.e.*, that the request for the instruction had been made and that a specific objection to the court's denial of the request had been interposed as well. Accordingly, we decline the Commonwealth's suggestion of waiver, and we turn now to the merits of Appellant's issue.

Voluntary manslaughter is defined as follows:

**(a) General rule.**—A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) the individual killed; or

(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

**(b) Unreasonable belief killing justifiable.**—A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title, but his belief is unreasonable.

18 Pa.C.S. § 2503(a), (b).

Appellant does not cite the specific elements of the statute or specify whether a "heat of passion" voluntary manslaughter instruction under subsection (a), or an "imperfect self-defense" voluntary manslaughter instruction under subsection (b), was warranted by the evidence of record. Instead, Appellant simply argues that he was entitled to a voluntary manslaughter instruction because the Commonwealth's evidence showed that Thomas had been intoxicated and had stepped on Appellant's foot causing a confrontation with Appellant, after which Thomas retreated toward a bedroom to get a gun. Appellant's Brief at 55–56. Appellant then claims, without citation to authority, that even under his defense of innocence, he had been entitled to the instruction because **Miranda's** defense was that Appellant had been "provoked" into killing.[16] Finally, Appellant argues that the constitutions of the United States and of Pennsylvania require an instruction on a lesser-included offense when it is supported by the evidence of record. The Commonwealth responds that the evidence here

**16.** Miranda's counsel surmised during closing argument that Appellant had been provoked by Thomas, who had stepped on Appellant's foot, and that when "words were exchanged" and Thomas did not apologize but began to walk down the hallway and Carmona yelled for him to get a gun, Appellant "snapped." Appellant's Brief at 58.

314 

did not support an instruction on voluntary manslaughter. We agree.

 This Court has explained, with respect to a "heat of passion" voluntary manslaughter instruction:

> [A] voluntary manslaughter instruction is warranted only where the offense is at issue and the evidence would support such a verdict. To support a verdict for voluntary manslaughter, the evidence would have had to demonstrate that, at the time of the killing, [a]ppellant acted under a sudden and intense passion resulting from serious provocation by the victim.

*Commonwealth v. Montalvo,* 604 Pa. 386, 986 A.2d 84, 100 (2009) (internal citations, quotation marks and emphasis omitted). "If any of these be wanting—if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder." *Commonwealth v. Hutchinson, supra* at 315 (quoting *Commonwealth v. Miller,* 605 Pa. 1, 987 A.2d 638, 651 (2009)).

 Moreover, "unreasonable belief voluntary manslaughter," sometimes loosely referred to as "imperfect self-defense," *Commonwealth v. Tilley,* 528 Pa. 125, 595 A.2d 575, 582 (1991) (citing 18 Pa.C.S. § 2503(b)), will only justify a voluntary manslaughter instruction in limited circumstances: where a defendant held "an unreasonable rather than a reasonable belief that deadly force was required to save [his or her] life," and "all other principles of justification under 18 Pa.C.S. § 505 [ ] have been met." *Id.* Generally, the use of deadly force is not justifiable "unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat[.]" 18 Pa.C.S. § 505(b)(2). Although a defendant has no burden to prove a claim of self-defense before such a defense is properly in issue, "there must be some evidence, from whatever source, to justify such a finding." *Commonwealth v. Sepulveda,* 55 A.3d 1108, 1124 n. 13 (Pa.2012). The evidentiary elements necessary to prevail on a

justification defense are that the defendant (a) reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) was free from fault in provoking the difficulty which culminated in the slaying; and (c) did not violate any duty to retreat. *Id.* at 1124 (citing 18 Pa.C.S. § 505).

This Court has long held that no jury charge is required on the elements of voluntary manslaughter where the defendant denies having committed the killing. In *Commonwealth v. White*, 442 Pa. 461, 275 A.2d 75, 77 (1971), we affirmed a judgment of sentence for first-degree murder where no instruction on voluntary manslaughter had been given. We reasoned: "A request for a charge on voluntary manslaughter could only be based on a theory that appellant actually shot the deceased but under circumstances of legal passion or provocation. Here[,] appellant denied shooting the victim. No evidence was offered concerning legal provocation or passion. In such circumstances, the trial judge is not required to charge the jury on the issue of manslaughter." *Id.* (*citing Commonwealth v. Corbin*, 432 Pa. 551, 247 A.2d 584 (1968); *Commonwealth v. Heckathorn*, 429 Pa. 534, 241 A.2d 97 (1968)).

In the case *sub judice*, we hold that no voluntary manslaughter instruction was warranted because Appellant denied that he shot anyone. *See id.* Moreover, the record evidence simply does not reflect either that Appellant had been seriously provoked when Thomas allegedly stepped on Appellant's foot and the two exchanged words, *see Hutchinson, supra,* or that deadly force on Appellant's part was even remotely necessary, given that Thomas did not have a gun in his possession at the time he was shot, and given that Appellant, the interloper here, could have simply retreated from the apartment. *See Sepulveda, supra.* Therefore, we also reject Appellant's derivative claim that he was prejudiced during the penalty phase by the court's denial of a voluntary manslaughter instruction, a claim based on his wholly speculative premise that had the jury been so instructed, he would not have

been convicted of the murder of Thomas, thereby eliminating that consideration as an aggravating circumstance in the jury's determination of the appropriate penalty for the murder of Diaz.

**V. The trial court erred by allowing the Commonwealth to make improper and prejudicial comments throughout the guilt phase closing argument, by overruling Appellant's objections to these comments, and by denying his request for a cautionary instruction; as a result, Appellant was denied due process of law.**

Appellant's Brief at 61.

▆▆ Appellant first claims prosecutorial misconduct with respect to several portions of the Commonwealth's guilt phase closing argument in which the prosecutor commented that Appellant had lied during his trial testimony. The defense made contemporaneous objections, which the trial court denied. We review the trial court's rulings for abuse of discretion. *Commonwealth v. Chamberlain*, 612 Pa. 107, 30 A.3d 381, 408 (2011). Appellant claims the alleged misconduct denied him due process and the right to a fair trial. We disagree.

▆▆ Although a prosecutor may comment on the credibility of the defendant or other witnesses, it is improper for a prosecutor to express a personal belief as to their credibility. *Commonwealth v. Chmiel*, 585 Pa. 547, 889 A.2d 501, 545 (2005). A prosecutor may make fair comment on the admitted evidence and may provide fair rebuttal to defense arguments. *Commonwealth v. Spotz*, 616 Pa. 164, 47 A.3d 63, 97 (2012) (*quoting Commonwealth v. Spotz*, 610 Pa. 17, 18 A.3d 244, 288 (2011) (additional citations omitted)). Even an otherwise improper comment may be appropriate if it is in fair response to defense counsel's remarks. *Id.* Any challenge to a prosecutor's comment must be evaluated in the context in which the comment was made. *Id.* The effect of the prosecutor's remarks must be evaluated in the context and atmosphere of the entire trial. *Commonwealth v. Cox*, 556 Pa. 368, 728 A.2d 923, 932 (1999) (*citing Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873, 882 (1975)).

Moreover, not every unwise, intemperate, or improper remark made by a prosecutor mandates the grant of a new trial. *Commonwealth v. Cox*, 603 Pa. 223, 983 A.2d 666, 687 (2009). "Reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict." *Id.* To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial. *Id.* at 685 (quoting *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987)). The touchstone is the fairness of the trial, not the culpability of the prosecutor. *Id.*

Here, prior to the prosecutor's comments, during closing argument for the defense, defense counsel frequently commented negatively on the credibility and veracity of the Commonwealth's witnesses and argued that the version of events they had presented was not worthy of belief. Indeed, counsel expressly argued to the jury that a particular portion of Carmona's testimony had been "total fabrication," that some of the facts to which she testified had "never happened," and that Martinez had given police a "famous lie statement, where he lied, lied, lied." N.T. Trial, 9/29/08, at 49–55. Then, with an almost theatrical flair as evidenced by the phraseology and rhetorical technique employed, defense counsel addressed the prosecutor by name and beseeched "Mr. Gambardella" to explain why Miranda would tell Martinez to lie to the police. In practically the next breath, counsel followed up on that theme by arguing to the jury, "[W]ho comes in and tells that same lie? Jessica Carmona. Hmmm, what a coincidence. Why is she telling the same lie? The same lie." *Id.* Conversely, when counsel commented to the jury about Appellant's testimony, he repeatedly characterized it as "the truth." *Id.* at 87–88.

In denying Appellant's objections to the prosecutor's comments in his closing argument that Appellant's testimony was

a lie, the court correctly noted that the prosecutor's comments had not been made as statements of his personal opinion and had been a fair response to the arguments made by defense counsel. Credibility was a fundamental aspect of this case given the conflicting versions of events presented by the witnesses. In recognition of this important aspect of the case, a large portion of defense counsel's closing argument was understandably directed at the credibility of the Commonwealth's witnesses. It is clear that the prosecutor's attack upon Appellant's credibility was in response to, and was commensurate with, the preceding defense attacks upon the credibility of Carmona and Martinez. That being the case, and given that the prosecutor did not characterize his attack on Appellant's credibility as reflecting his own personal opinion, we determine that the prosecutor's comments on Appellant's credibility were not improper.

■ Appellant also alleges prosecutorial misconduct with respect to the prosecutor's comment on Appellant's lack of remorse. The court sustained Appellant's objection at trial but did not give a curative instruction to the jury. Appellant now claims that, at a minimum, a curative instruction was necessary to ensure a fair trial. The trial court explained, in its supplemental Rule 1925(a) opinion, that a curative instruction was not necessary because the comment was not so inflammatory that its unavoidable effect would have been to render the jury incapable of returning a fair verdict. Additionally, the court explained that it had purposely declined to give a curative instruction in order to avoid unnecessarily exaggerating the significance of the remark. Trial Court Opinion, dated 4/26/11, at 57.

■■ This Court has held that it is within the sound discretion of the trial court to determine whether a curative instruction is necessary. *Commonwealth v. Moore*, 534 Pa. 527, 633 A.2d 1119, 1127 (1993). Moreover, as the trial court expressly determined here, curative instructions are not always necessary, or even desirable. Bearing in mind that the court must assure the defendant a fair trial, the trial judge must be allowed reasonable discretion in determining whether

or not to give curative instructions. *See Commonwealth v. Pezzeca,* 749 A.2d 968, 971 (Pa.Super.2000) (holding same). Given that the comment complained of here was but a single, fleeting sentence, we cannot hold that the court abused its discretion by determining not to issue what it considered to be an unnecessary curative instruction, one that would have unnecessarily exaggerated the import of the inappropriate remark.

■ Appellant also argues that the trial court erred in overruling his objection to a portion of the prosecutor's allegedly improper cross-examination of Appellant that served no purpose other than to belittle Appellant and thereby evidenced the prosecutor's disdain for him. Appellant specifically challenges the following questioning as having been improper:

Q. [by the prosecutor] Okay, so basically, Miranda is the killer, right?

A. [by Appellant] Uh-huh.

Q. Yes?

A. Correct.

Q. And once Miranda gets taken into custody, you're home free, right?

MR. McMAHON: Objection.

THE COURT: No, I'll permit it. It's cross-examination. Overruled.

[Appellant]: What do you mean by "home free?"

Q. [by the prosecutor] He's the killer. You had nothing to do with this. Once he gets picked up, you think you're in great shape, right, you're just a witness?

A. I'm hoping not even to be a witness at all.

Q. Well, you are just a bystander, right?

A. Uh-huh.

Q. So, once he gets picked up, you have no problems, right?

A. Absolutely.

N.T. Trial, 9/26/08, at 179–180.

The trial court reasoned as follows that the above was proper:

There is nothing in this passage to suggest that the prosecutor's comments referred to irrelevant or extraneous matters that would persuade the jury to become "prejudiced in favor of deductions not legitimately derived from the evidence," nor could those comments be construed as inflammatory or suggestive to the jurors of "a fixed bias and hostility toward the defendant" which would incapacitate their ability to "weigh the evidence and render a true verdict." To the contrary, by suggesting to Appellant during cross-examination that he had a motive to avoid prosecution and would be "home free" if his co-defendant was apprehended for the murders, the prosecutor properly challenged Appellant's credibility and tested his version of the events which included the allegation that his co-defendant was the murderer. Furthermore, after observing that Appellant's response to the prosecutor's question was a definitive "Absolutely," it is readily apparent that the prosecutor's cross-examination was relevant.

Trial Court Opinion, dated 4/26/11, at 49 (citations omitted in original).

We agree that the challenged questioning was proper and did not amount to prosecutorial misconduct, and we adopt the trial court's sound reasoning as our own disposition of the issue.

■■■■ Appellant also alleges that the prosecutor committed misconduct during his closing argument to the jury when he "hectored" Appellant by looking at him and stating, "[T]hat's not how you care about somebody" while commenting on Appellant's killing of Diaz. Appellant's Brief at 64–65. Appellant claims the prosecutor was "improperly interacting" with Appellant at that point and that the court erred in overruling Appellant's objection because the prosecutor "personally confronted" and "directly addressed" Appellant. *Id.* The Commonwealth responds that "whether the prosecutor was looking at Appellant when the statement was made or not, in context,

the prosecutor was clearly addressing the jury." Appellee's Brief at 53. Moreover, the Commonwealth argues that the comment was fair response to Appellant's testimony in which he claimed to have had a good relationship with Diaz, and that the comment was "at most, merely oratorical flair on the part of the prosecutor." *Id.*

We note that the record does not reflect whether the challenged comment was directed personally at Appellant. From a purely vernacular standpoint, despite the prosecutor's use of a personal pronoun, the statement could have easily been interpreted by the jury to mean that "that's not how **one** cares for somebody." Nevertheless, we recognize that the objection posed at trial was not so much as to what the prosecutor said as to how he said it. The objection was specifically made as to the "interaction with this defendant, that's improper." N.T. Trial, 9/29/08, at 133. The objection was overruled.

Despite Appellant's claim that the comment was a personal attack evidencing the prosecutor's alleged animus toward him, Appellant makes no allegation that the prosecutor moved toward Appellant in the courtroom as he spoke, or pointed to him, or gesticulated in any other way when he made the challenged comment. Indeed, Appellant's allegation is unsupported by any objective showing other than the fact that Appellant made an objection at trial that was overruled. We reiterate that reversible error for an improper prosecutorial remark exists only when the unavoidable effect of the challenged remark would be to prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that they could not fairly weigh the evidence and render a true verdict. *See Spotz, supra,* 47 A.3d at 97. Viewing the challenged remark in that context, and on this record, we conclude that a new trial is not warranted on this issue.

**VI. Appellant's right to counsel was violated when he was unrepresented during his preliminary hearing.**

Appellant's Brief at 68.

As previously explained, due to counsel's failure to appear at Appellant's scheduled preliminary hearing, it was

conducted in his absence. Counsel later filed a motion to remand for a preliminary hearing, but the motion was dismissed when counsel failed to appear for the hearing on the motion. Nevertheless, a second preliminary hearing was later conducted with counsel present. Appellant alleges that conducting this second hearing "did not remedy the original constitutional error [or] render it harmless ... [because] ... [a]t the second hearing, the Commonwealth presented different witnesses than it did at the first[.]" Appellant's Brief at 69. The gravamen of Appellant's argument is that Carmona, who testified at the original preliminary hearing, did not testify at the second hearing, thereby negating the opportunity for counsel to cross-examine her prior to trial, which might "have led to the dismissal or reduction of charges" or may have "secure[d] a voluntary manslaughter charge." Appellant's Brief at 69–70.

The purpose of a preliminary hearing is to avoid the incarceration or trial of a defendant unless there is sufficient evidence to establish that a crime was committed and a probability that the defendant was connected therewith. *See Commonwealth v. Jackson*, 849 A.2d 1254, 1257 (Pa.Super.2004) (holding same). Although a preliminary hearing may permit capable defense counsel to lay the groundwork for a trial defense, its intended purpose is not primarily to provide defense counsel with the opportunity to assess the credibility of Commonwealth witnesses, or to prepare a defense theory for trial, or to design avenues for the impeachment of witnesses at trial. Nor is the purpose of a preliminary hearing to prove a defendant's guilt. Indeed, once a defendant has gone to trial and has been found guilty of the crime or crimes charged, any defect in the preliminary hearing is rendered immaterial. *See id.* Accordingly, because Appellant's primary complaint here is simply that he lost a pre-trial opportunity to cross-examine a Commonwealth witness, and because Appellant was properly convicted of the crimes charged following a trial on the merits, we determine that Appellant is entitled to no relief.

**VII. Appellant's death sentence is unlawful because 42 Pa.C.S. § 9711(c)(1)(iv) does not require the jury to find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, in violation of *Ring v. Arizona, Apprendi v. New Jersey,* and *In Re Winship.***

Appellant's Brief at 75.

■■■ The challenged statutory provision prescribes that before the jury retires to consider the sentencing verdict following a conviction for first-degree murder, the court shall instruct the jury that their verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances, while the verdict must be a sentence of life imprisonment in all other cases. 42 Pa.C.S. § 9711(c)(1)(iv). Appellant alleges that his death sentence is unlawful because the statute does not require the jury to find that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. Appellant acknowledges that this Court has previously rejected this precise claim. *See Commonwealth v. Roney,* 581 Pa. 587, 866 A.2d 351 (2005) (holding that application of Section 9711(c)(1)(iv) in determining whether aggravating circumstances outweigh mitigating circumstances does not implicate the fact-finding concerns articulated in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)).

Nevertheless, Appellant asks to reconsider our determination in *Roney* in light of *United States v. Gabrion,* 648 F.3d 307 (6th Cir.2011), where an analogous provision of the Federal Death Penalty Act of 1994, 18 U.S.C.S. § 3591, *et seq.,* was initially held to be unconstitutional under *Apprendi, supra,* and *Ring, supra,* by a three judge panel of that court. However, after briefing in this matter concluded, the Sixth Circuit Court of Appeals granted reargument *en banc* in *Gabrion,* and thereafter determined that the reasonable doubt standard does not apply to the weighing of aggravating and

mitigating factors. *United States v. Gabrion*, 719 F.3d 511, 532 (6th Cir.2013) (*en banc*). The Sixth Circuit Court of Appeals reasoned that the weighing process constitutes not a factual determination, but a complex moral judgment. *Id.* Accordingly, we decline Appellant's invitation to revisit our decision in *Roney, supra*, which controls the determination of this issue, and compels us to determine that Appellant's claim lacks merit.

**Statutory Review**

We conduct our review pursuant to 42 Pa.C.S. § 9711(h)(3). Following review of the facts and the record, we conclude that the sentence of death was not the result of "passion, prejudice, or any other arbitrary factor," but rather was based on the Commonwealth's evidence admitted at trial. *Id.* In addition, we conclude that the evidence admitted at trial was sufficient "to support the finding of at least one aggravating circumstance." *Id.* The verdict and sentence of death are hereby affirmed.[17]

Former Justice ORIE MELVIN did not participate in the decision of this case.

Chief Justice CASTILLE, Justices EAKIN, BAER and TODD join the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice SAYLOR files a concurring opinion.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion. I write separately for two reasons: (1) to address further appellant's argument that his waiver of several claims of trial court error may be overcome by virtue of this Court's statutory review of death sentences for passion, prejudice and arbitrariness ("PPA"); and in particular, to suggest that PPA review be revisited by the General Assembly; and (2) to note the record representations made

**17.** The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania. *See* 42 Pa.C.S. § 9711(i).

by appellant's federal counsel, associated with the Federal Community Defender's Office (the "FCDO"), regarding its role in representing capital defendants in state court proceedings.

I.

As recounted by the Majority, appellant attempts to litigate four separate waived claims by invoking this Court's statutory review of the death penalty, as follows:

**Issue 10:** that this Court must vacate appellant's sentence because it was the product of passion, prejudice, and other arbitrary factors because the trial court failed: to ensure that all jurors were life-qualified to serve; to prevent or address the jurors' exposure to the prosecution's improper bolstering of Jessica Carmona's testimony during the guilt phase, to inadmissible evidence of appellant's prior criminal conduct, and to inappropriate behavior by two detectives in court.

*See* Appellant's Brief at 77–87. Appellant frames his claims as implicating trial court error, even if a claim was neither preserved nor presented timely to the trial court so that it could rule, much less commit error. Notably, in its opinion, the trial court addressed the merits of appellant's various claims, without recognizing the Commonwealth's waiver arguments, or other record waivers.

With respect to issue 10, the Commonwealth appears not to recognize that the claim in its entirety, as presented—*i.e.,* as an attempt to reinstate relaxed waiver review of claims under the aegis of statutory review in capital cases—is not available on direct appeal for such run-of-the-mill issues which obviously could have been joined at trial, but were not. Rather, the Commonwealth addresses the four claims individually, arguing that two of them—regarding the prosecution's comments vis-à-vis Carmona and the detectives' allegedly improper behavior—were waived by failure to object contemporaneously.

In his reply brief, appellant argues that he is entitled to substantive review of these waived claims because they sup-

posedly establish that his death sentence—imposed in a case where he murdered two people with gunshots to the head, and shot and wounded a third person (a defenseless woman who was lying on the floor protecting her child)—was the result of passion, prejudice, or other arbitrary factors. Appellant's Reply Brief at 6–7 (citing 42 Pa.C.S. § 9711(h)(3)). In so arguing, appellant urges the Court to reconsider its decisions in *Commonwealth v. Chambers*, 602 Pa. 224, 980 A.2d 35 (2009) and *Commonwealth v. May*, 612 Pa. 505, 31 A.3d 668 (2011), decisions which appellant's counsel ignored in appellant's principal brief. Appellant is essentially arguing that this Court should reestablish relaxed waiver on direct capital appeal.

The Majority correctly declines the invitation to overrule the decisions in *Chambers* and *May*, noting that we have determined that statutory penalty review does not operate to preserve waived claims. Majority Op. at 299–300, 82 A.3d at 971, citing *Commonwealth v. VanDivner*, 603 Pa. 318, 983 A.2d 1199, 1205 (2009). Parenthetically, I note that a majority of the Court recently reaffirmed this very point in *Commonwealth v. Padilla*, 622 Pa. 449, 80 A.3d 1238, 1272–73 (2013).

To the Majority's discussion, I add the following. Appellant raises a point in support of relaxed waiver that may not have been squarely posed in the prior cases. He argues that restricting statutory review to preserved claims and declining to review defaulted claims under the aegis of statutory PPA review "render[s] this Court's Section 9711(h)(3) statutory duty a nullity." According to appellant, because he could obtain "substantive review of any claim that has been preserved below on its own merit, review for the influence of passion and prejudice would only duplicate what has already be [sic] done." Appellant's Reply Brief at 7. In my view, this argument is mistaken for multiple reasons. First, although the statutory standard is vague, nothing in the statute purports to excuse issue preservation, particularly with respect to the sort of garden variety issues posed here. The proper counter to appellant's expansive construction is that his theory would make "nullities" of Pa.R.A.P. 302 (requiring issue pres-

ervation below), the PCRA (the presumptive repository for collateral claims not raised at trial), *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002) (enforcing the PCRA by requiring deferral of ineffectiveness claims to PCRA review), *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003) (prospectively eliminating the relaxed waiver doctrine in direct capital appeals), and *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (establishing core concept of assessing ineffectiveness claims under the law in existence when the case was tried).

Second, in point of fact, appellant's "nullity" argument fails because the Court has invoked the statutory standard to support a grant of penalty relief upon a preserved claim. *See Commonwealth v. Boczkowski*, 577 Pa. 421, 846 A.2d 75 (2004) (Commonwealth's unilateral decision contrary to existing court order to extradite appellant to North Carolina to be tried for prior murder, upon which sole aggravator introduced at Pennsylvania trial and related certification of appellant as death-eligible were premised, introduced arbitrary factor into appellant's sentencing). The penalty phase claim at issue in *Boczkowski* was preserved at trial, and statutory review was not used to subvert issue preservation principles (and to secure a more favorable level and standard of review for the defendant), or to avoid having to litigate a defaulted claim through the guise of ineffective assistance of counsel and a fully developed factual record. Rather, this Court cited to the statutory review factors only to assess the merits of the preserved issue. 846 A.2d at 100–01.

Third, appellant's proposed construction of statutory review would eviscerate the issue preservation principles of the PCRA because his reading rests on the premise that run-of-the-mill claims, such as those pursued here, implicate statutory PPA review. Appellant offers no legal authority to support that premise.[1]

1. The better teaching in this area is from *Freeman,* which recognized that there may be a "particular claim ... of such primary constitutional magnitude that it should be reached on appeal" notwithstanding its

Finally, to the extent appellant purports to address the purpose of PPA review under Section 9711(h)(3), it may be past time to consider both the fundamental purpose of PPA review as originally conceived by the General Assembly, and its surviving purpose, given developments in death penalty review since that time. There is an obvious counterargument to appellant's position that the statute means that defendants may raise any defaulted claim on appeal so long as they quote the statute. Since the provision was adopted in 1978, *see* Act 141 of Sept. 13, 1978, Pub. Law 756, there has been a considerable evolution—or, more accurately, a revolution—in death penalty practice and review that has emerged from the U.S. Supreme Court's decisional law. It is more than likely that the PPA review paradigm was adopted as a defensive measure at a time when no state could predict with certainty the sort of death penalty regime—if any—that might be approved by the U.S. Supreme Court.

PPA review appears to represent a short-form expression of some of the concerns that had led the High Court, in its fractured decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (*per curiam*), to hold "that the imposition and carrying out of the death penalty in the[ three] cases [then before the Court] constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." *Id.* at 239, 92 S.Ct. 2726. Indeed, for the Justices whose view prevailed, a common concern was that the discretion reposed by the legislative branch in judges and juries to impose a sentence of death allowed for selective, arbitrary, or prejudiced administration of the penalty. *Id.* at 255, 92 S.Ct. 2726 (Douglas, J., concurring); *see also id.* at 293–95, 92 S.Ct. 2726 (Brennan, J., concurring) ("our procedures are not constructed to guard against the totally capricious selection of criminals for the punishment of death"; "[t]he probability of arbitrariness is sufficiently substantial that it can be relied upon, in combination with the other principles, in reaching a judgment on the constitutionality of

waiver below. 827 A.2d at 402. The complaints comprising appellant's Issue 10 hardly qualify.

this punishment"); *id.* at 310, 92 S.Ct. 2726 (Stewart, J., concurring) ("I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed."); *id.* at 310–11, 92 S.Ct. 2726 (White, J., concurring) ("In joining the Court's judgments, therefore, I do not at all intimate that the death penalty is unconstitutional *per se* or that there is no system of capital punishment that would comport with the Eighth Amendment.... Legislative 'policy' is thus necessarily defined not by what is legislatively authorized but by what juries and judges do in exercising the discretion so regularly conferred upon them. In my judgment what was done in these cases violated the Eighth Amendment."); *id.* at 364–66, 92 S.Ct. 2726 (Marshall, J., concurring) (because of untrammeled jury discretion, "capital punishment is imposed discriminatorily against certain identifiable classes of people": the poor, the ignorant, the under privileged, minorities, and men). *Accord id.* at 397, 92 S.Ct. 2726 (Burger, C.J., joined by Blackmun, Powell, and Rehnquist, JJ., dissenting) ("The actual scope of the Court's ruling, which I take to be embodied in these concurring opinions, is not entirely clear. This much, however, seems apparent: if the legislatures are to continue to authorize capital punishment for some crimes, juries and judges can no longer be permitted to make the sentencing determination in the same manner they have in the past."); *Gregg v. Georgia,* 428 U.S. 153, 206, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) ("The basic concern of *Furman* centered on those defendants who were being condemned to death capriciously and arbitrarily.").

*Furman* effectively suspended capital punishment in the U.S., leading state legislatures to scramble to devise new capital sentencing regimes. *See Commonwealth v. Moody,* 476 Pa. 223, 382 A.2d 442, 444–45 & n. 9 (1977) (*Furman* "in effect invalidated Pennsylvania's prior death-penalty statute," Act of June 24, 1939, Pub. Law 872, § 701, as amended); *Commonwealth v. McKenna,* 476 Pa. 428, 383 A.2d 174, 178 n. 8 (1978) ("The *Furman* decision evoked a wide legislative

reaction throughout the United States, with some thirty-five states adopting new death penalty statutes. The remedial legislation invariably took one of two forms."). *Furman* was a strange new rule indeed, generating a broad mandate to restrict state power in capital cases without offering any governing rationale. *Accord Furman,* 408 U.S. at 403, 92 S.Ct. 2726 (Burger, C.J., joined by Blackmun, Powell, and Rehnquist, JJ., dissenting) ("Since there is no majority of the Court on the ultimate issue presented in these cases, the future of capital punishment in this country has been left in an uncertain limbo. Rather than providing a final and unambiguous answer on the basic constitutional question, the collective impact of the majority's ruling is to demand an undetermined measure of change from the various state legislatures and the Congress."). States that determined to pursue the traditional power to seek the ultimate penalty for the most serious of crimes were left to become legal archaeologists, searching among the various expressions for clues as to what would satisfy the cobbled-together views of a majority of five High Court justices.

Subsequently, in 1976, the High Court considered the attempts of five different states to reinstitute capital punishment in a way that addressed the concerns expressed in the various opinions in *Furman;* three statutes were approved (Georgia, Florida, and Texas) and two disapproved (North Carolina and Louisiana). *See Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). As in *Furman,* the cases generated multiple expressions from the several Justices.

The three statutes that were approved included standards developed for the Model Penal Code. *See, e.g., Gregg v. Georgia,* 428 U.S. at 193–95 & n. 44, 96 S.Ct. 2909 (quoting Am. Legal Institute, Model Penal Code § 210.6 (Proposed

Official Draft 1962)).[2] The standards developed by the drafters of the Model Penal Code implicated the weighing of enumerated aggravating and mitigating circumstances in a bifurcated penalty phase proceeding. The *Gregg* Opinion of Justices Stewart, Powell, and Stevens explained that:

> While such standards are by necessity somewhat general, they do provide guidance to the sentencing authority and thereby reduce the likelihood that it will impose a sentence that fairly can be called capricious or arbitrary. Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner.

*Id.* at 193–95, 96 S.Ct. 2909 (opinion of Stewart, Powell, and Stevens, JJ.) (footnote omitted). In contrast, the Texas and Louisiana statutes, which the High Court disapproved, narrowed the categories of crimes for which the death penalty could be imposed but made the penalty mandatory; this approach had been predicted by the dissenting Justices in *Furman*. *See Furman*, 408 U.S. at 400, 92 S.Ct. 2726 (Burger, C.J., joined by Blackmun, Powell, and Rehnquist, JJ., dissenting) ("Since the two pivotal concurring opinions turn on the assumption that the punishment of death is now meted out in a random and unpredictable manner, legislative bodies may seek to bring their laws into compliance with the Court's ruling by providing standards for juries and judges to follow in determining the sentence in capital cases or by more narrowly defining the crimes for which the penalty is to be imposed."); *see, e.g., Roberts v. Louisiana*, 428 U.S. at 334–35, 96 S.Ct. 3001 (opinion of Stewart, Powell, and Stevens, JJ.). In a later case, addressing Nevada's death penalty statute, the U.S. Supreme Court summarized the effect of the High Court's decisions on the development of capital punishment legislation by states:

**2.** The American Law Institute has withdrawn Section 210.6 of the Model Penal Code effective October 23, 2009. *See* Model Penal Code § 210.6.

Nevada's adoption of a mandatory-sentencing scheme represented one of the two responses of various States to the *Furman* decision. Although every State had abandoned mandatory capital-sentencing procedures prior to *Furman* because they had proved unsatisfactory, some States, including Nevada, enacted mandatory statutes after *Furman*. Those States read the several opinions supporting the judgment in *Furman* as a signal that mandatory-sentencing procedures would avoid the arbitrary and capricious pitfalls of unguided discretionary procedures. Other States, however, maintained individualized sentencing, but narrowed the category of offenses to which the penalty could be applied, bifurcated the trial to provide a separate sentencing proceeding, and provided guidance to the sentencing authority about how to determine the appropriateness of the death penalty in a particular case. The Court on prior occasions has recognized these differing responses to *Furman* and the uncertain state of capital-punishment law following that decision.

The Court's opinions in 1976 addressing the constitutionality of five post-*Furman* state statutes did much to clarify what standards must be met to render a capital-punishment statute facially constitutional. In explaining why the guided-discretion statutes of Georgia, Florida, and Texas were facially valid, but the mandatory statutes of North Carolina and Louisiana were not, the Court relied to a significant degree on the unique nature of the death penalty and the heightened reliability demanded by the Eighth Amendment in the determination whether the death penalty is appropriate in a particular case. The principal opinions in these cases established that in capital cases, "it is constitutionally required that the sentencing authority have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to imposition of a death sentence."

*Sumner v. Shuman*, 483 U.S. 66, 71–72, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987) (internal citations omitted). The focus of the High Court in addressing the prejudice and arbitrariness concerns of the *Furman* concurrences was on cabining the

discretion exercised by the factfinder at the penalty phase. Enhanced appellate procedures were also noted with approval: "As an important additional safeguard against arbitrariness and caprice, the Georgia statutory scheme provides for automatic appeal of all death sentences to the State's Supreme Court." *Gregg*, 428 U.S. at 198, 96 S.Ct. 2909 (opinion of Stewart, Powell, and Stevens, JJ.); *see also Proffitt*, 428 U.S. at 250–51, 96 S.Ct. 2960.

The Georgia scheme approved by the Court also included a provision obliging the reviewing State Supreme Court to conduct PPA review. While noting the inclusion of the PPA provision in the statute (along with aggravator sufficiency review and proportionality review), the High Court did not discuss PPA review specifically or separately. *Gregg*, 428 U.S. at 198, 205–06, 96 S.Ct. 2909 (opinion of Stewart, Powell, and Stevens, JJ.); *see id.* at 223, 96 S.Ct. 2909 (White, J., joined by Burger, C.J., and Rehnquist, J., concurring). Notably, the **absence** of PPA review did not render the Florida death penalty statute unconstitutional:

> The statute provides for automatic review by the Supreme Court of Florida of all cases in which a death sentence has been imposed. The [Florida] law differs from that of Georgia in that it does not require the court to conduct any specific form of review. Since, however, the trial judge must justify the imposition of a death sentence with written findings, meaningful appellate review of each such sentence is ma[de] possible and the Supreme Court of Florida like its Georgia counterpart considers its function to be to "(guarantee) that the (aggravating and mitigating) reasons present in one case will reach a similar result to that reached under similar circumstances in another case.... If a defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great."

*Proffitt*, 428 U.S. at 250–51, 96 S.Ct. 2960 (internal citations omitted); *accord Jurek*, 428 U.S. at 276, 96 S.Ct. 2950 ("By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition

of death sentences under law. Because this system serves to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed, it does not violate the Constitution."). The Model Penal Code also did not suggest appellate review procedures such as PPA review.

Presumably, statutory schemes such as the current one in Pennsylvania include PPA review because *Gregg* approved a statute containing such a paradigm. Prior to *Gregg*, the Pennsylvania General Assembly had adopted a "new" statutory scheme in 1974, intended to address the fractured concerns in *Furman. See Moody,* 382 A.2d at 445 & n. 10 (citing Act 46 of Mar. 26, 1974, Pub. Law 213, 18 Pa.C.S. § 1311).[3] But, in 1977, in light of *Gregg* and its companion cases, the *Moody* Court held the 1974 scheme unconstitutional because it enumerated mitigators rather than permitting the sentencing authority to consider all mitigating evidence relevant to the defendant's character and record. *Id.* at 447, 449–50. Accordingly, in 1978, the General Assembly once again amended the death penalty sentencing scheme. *See* Act 141 of Sept. 13, 1978, Pub. Law 756 (18 Pa.C.S. § 1311). This amended provision was renumbered in 1980 and placed in the Judicial Code. *See* 42 Pa.C.S. § 9711.

Although the death penalty statute has since been amended again, Pennsylvania's sentencing scheme retains the general approach adopted in 1978. Pennsylvania's scheme—like that approved by the U.S. Supreme Court in *Gregg*—provided for a weighing of aggravating and mitigating circumstances by the sentencing authority; reposed an automatic appeal in the Pennsylvania Supreme Court; and directed that appellate review includes the mandate that: "The Supreme Court shall

---

**3.** The General Assembly had also adopted a stop-gap measure in 1972, which simply re-authorized the death penalty in Pennsylvania by providing: "a person who has been convicted of murder of the first degree shall be sentenced to death or to a term of life imprisonment." The Pennsylvania Supreme Court held the provision constitutionally infirm. The Court viewed the provision as "an abbreviated form of the unconstitutional Act of 1939 which it replaced, and more procedurally defective because of the abbreviation," because it allowed the sentencing authority "unbridled discretion" to determine the propriety of the death penalty. *McKenna,* 383 A.2d at 178 & n. 8.

affirm the sentence of death unless it determines that: (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor." *See* 42 Pa.C.S. § 9711(h)(3). In 1982, the Supreme Court of Pennsylvania approved the legislative scheme enacted in 1978. *See Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 960–61 (1982). Notably, while the *Zettlemoyer* Court recognized the importance of adequate appellate review of death sentences, the Court emphasized that the High Court had never said in *Gregg*, or elsewhere, that any particular type of review, including PPA review, is required. "It is true, as appellant and *amici* point out, that the elaborate administrative procedures provided by statute in Georgia to facilitate and expedite appellate review by the Supreme Court of Georgia were well received by the United States Supreme Court in *Gregg v. Georgia, supra.* The suggestion that such mechanisms are constitutionally required, however, flies in the face of the latter Court's explicit pronouncement in *Proffitt v. Florida, supra.*" 454 A.2d at 960–61.[4]

In the years since *Gregg*, the High Court has continued to be active in adjusting capital review, to the point where there is no logical place for the PPA review Georgia inserted into its post-*Furman* death penalty statute in the hope of addressing the varied concerns in *Furman.* The vagaries of court-conducted PPA review to eliminate "freakish" impositions of the death penalty have been supplanted by specific review schemata emerging from Court decisions narrowing the availability of the death penalty, and directly addressing *Furman*'s

---

4. Indeed, the Georgia scheme approved in *Gregg* provided for proportionality review, and Pennsylvania's 1978 death penalty procedures included a similar provision. Proportionality review, like PPA review, represented a predictive judgment of what might be required to satisfy the Eighth Amendment. In fact, however, the High Court has required neither form of review. The proportionality review provision was repealed by the General Assembly in 1997. *See* Act 28 of June 25, 1997, Pub. Law 293, § 1 (repealing 42 Pa.C.S. § 9711(h)(3)(iii), which "required reversal of a sentence of death that was 'excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.' "); *see, e.g., Commonwealth v. Laird*, 605 Pa. 137, 988 A.2d 618, 647 (2010).

concerns regarding unbridled capital sentencers returning a death verdict on the basis of "passion, prejudice or arbitrariness." That decisional law has, among many other restrictions, mandated consideration of expansive mitigating circumstances, while limiting aggravators to specifically authorized factors; required an uneven weighing of mitigators versus aggravators (slanted in favor of the defendant); and excluded certain defendants from the ultimate penalty (*e.g.*, non-murderers; murderers under the age of 18; murderers who are mentally retarded). I briefly described certain of the developments in my concurrence in *Commonwealth v. Gibson,* 597 Pa. 402, 951 A.2d 1110 (2008):

Soon after re-authorizing the separate States to provide for capital punishment in the 1970s, the U.S. Supreme Court innovated what amounts to a "kitchen sink" rule concerning mitigation evidence in capital trials, and imposed that new rule upon the States. For reasons which are now primarily of academic or historical interest, Supreme Court case decisions have left us with a regime where those States that adopted capital punishment: (1) must require proof of specific aggravating circumstances to distinguish among first-degree murderers in order to limit capital punishment to those who are "the worst of the worst," and (2) must not categorically preclude capital defendants from introducing, and factfinders from considering, any evidence in mitigation relating to the defendant's character or record (a very broad category) and the circumstances of the crime. *See Eddings v. Oklahoma,* 455 U.S. 104, 112 [102 S.Ct. 869, 71 L.Ed.2d 1] (1982) (adopting *Lockett v. Ohio,* 438 U.S. 586, 604 [98 S.Ct. 2954, 57 L.Ed.2d 973] (1978) (plurality opinion)). For a thorough and illuminating description of the development of the mitigation evidence requirement imposed on the States—what Justice Clarence Thomas has called "[t]he mitigating branch of our death penalty jurisprudence"—see Justice Thomas's concurring opinion in *Graham v. Collins,* 506 U.S. 461, 479–92 [113 S.Ct. 892, 122 L.Ed.2d 260] (1993) (Thomas, J., concurring). The Pennsylvania General Assembly has adopted a conforming death penalty statute that follows the federal judicial command, with a series of enu-

merated aggravating and mitigating circumstances, including a "catchall" mitigator. 42 Pa.C.S. § 9711.

The resulting High Court-dictated penalty paradigm involves "weighing" what seem to be competing considerations, but in fact capital sentencing is twice heavily slanted in favor of a non-death verdict. First, not all first-degree murderers are eligible for the death penalty: in Pennsylvania, the Commonwealth has to prove, beyond a reasonable doubt, a specific statutory aggravator or aggravators. Second, even if the Commonwealth proves the defendant's exceptionality among his brethren of first-degree murderers, the defendant is guaranteed an opportunity for the jury—and all it takes is one juror—to spare him from death for reasons having to do with mitigation.[3] The High Court's decisional law in the wake of this paradigm has been subjected to constant "tinkering" (Justice Harry Blackmun's famous coda)[4] or "annual improvisation" (Justice Scalia)[5] resulting in new or retooled rules—concerning who is eligible, level of proof, how the jury is to weigh the proof, what the jury is to be told, requirements of juror unanimity versus individual juror nullification, and so on. This reality, combined with the delays and multiple levels of exacting review, has further complicated capital jurisprudence.

---

3. Justice Antonin Scalia has described the two-part paradigm as follows:

[O]ver the years since 1972 this Court has attached to the imposition of the death penalty two quite incompatible sets of commands: The sentencer's discretion to impose death must be closely confined, *see Furman v. Georgia*, 408 U.S. 238 [92 S.Ct. 2726, 33 L.Ed.2d 346] (1972) (*per curiam*), but the sentencer's discretion **not** to impose death (to extend mercy) must be unlimited, *see Eddings v. Oklahoma*, 455 U.S. 104 [102 S.Ct. 869, 71 L.Ed.2d 1] (1982); *Lockett v. Ohio*, 438 U.S. 586 [98 S.Ct. 2954, 57 L.Ed.2d 973] (1978) (plurality opinion). These commands were invented without benefit of any textual or historical support. . . .

*Callins v. Collins*, 510 U.S. 1141, 1141–42 [114 S.Ct. 1127, 127 L.Ed.2d 435] (1994) (Scalia, J., concurring).

4. *Callins*, 510 U.S. at 1145 [114 S.Ct. 1127] (Blackmun, J., dissenting) ("From this day forward, I no longer shall tinker with the machinery of death.").

5. *See Morgan v. Illinois*, 504 U.S. 719, 751 [112 S.Ct. 2222, 119 L.Ed.2d 492] (1992) (Scalia, J., joined by Rehnquist, C.J., and Thomas, J., dissenting) (adverting to "the fog of confusion that is our annually improvised Eighth Amendment, 'death is different' jurisprudence").

951 A.2d at 1148–49 (Castille, C.J., joined by McCaffery, J., concurring).

Given the volatility in the U.S. Supreme Court's decisional law affecting capital punishment, there is some peril in implementing the latest new rules from the High Court. An erroneous interpretation of what the High Court intends by a new decision or a mis-prediction of what the High Court will require next can lead to a state decisional ruling or legislation that becomes a cancerous fixture, a constitutionalization of an error. *See, e.g., Commonwealth v. Mouzon,* 617 Pa. 527, 53 A.3d 738, 742–43 (2012) (addressing unsuccessful efforts to predict federal constitutional development regarding burden of proof respecting self-defense claims); *Commonwealth v. Wilson,* 620 Pa. 251, 67 A.3d 736 (2013) (General Assembly enacted statute that requires reasonable suspicion in searches of parolees in response to mis-prediction in *Commonwealth v. Pickron,* 535 Pa. 241, 634 A.2d 1093 (1993) that U.S. Supreme Court would interpret Fourth Amendment in that manner). The more prudent approach is to implement the federal command up to its limits, but no farther. *See Commonwealth v. Sanchez,* 614 Pa. 1, 36 A.3d 24 (2011); *accord Commonwealth v. Cunningham,* 622 Pa. 543, 81 A.3d 1, 8 (2013) (citing *Sanchez*) ("state judges who may be circumspect about evolving normative pronouncements of five of nine Justices—which forcefully are rejected by four others—may be reluctant to apply those standards more broadly than is absolutely required"); *id.* at 12–13 (Castille, C.J., concurring); *Commonwealth v. Weiss,* 622 Pa. 663, 81 A.3d 767, 811–12, 2013 WL 5848710 at *35 (2013) (Castille, C.J., concurring). Federal review is always available to correct errors in implementation.

These realities inform a proper understanding of what was intended by PPA review, and what role it should play now. The General Assembly in the 1970s evidently was intent upon reinstituting the prospect of capital punishment in Pennsylvania, adopting three separate review schemes in the wake of *Furman* and its progeny. In that volatile era, it made sense to track a statute that withstood an Eighth Amendment challenge in the High Court; why bait the bear? But in the 37 years since *Gregg* was decided, the High Court's decisional

pronouncements have channeled and narrowed the instances in which death may be pursued, how penalty-relevant evidence may be considered by a factfinder, and procedurally how the death sentence may be imposed at trial and survive appellate scrutiny. PPA review was designed to reduce the risk of an arbitrary or "freakish" sentence of death; pre-*Furman* juries with unbridled discretion had been free to indulge their passions and prejudices, including racial prejudice. The jurisprudence beginning with *Gregg* has done with specifics what PPA review sought to accomplish with a vague command; those cases have established rules and procedures that severely restrict the potentiality for a sentence of death to conform with Eighth Amendment requirements, and yet still pose a circumstance where the sentence was a result of "passion, prejudice or arbitrariness," requiring correction in advance of post-conviction review. To be sure, I still support the exception to direct appeal waiver left open in *Freeman,* respecting defaulted claims of primary constitutional magnitude. But, PPA review is not required to reach those claims, and it should not be employed to reinvigorate defaulted claims that bear no resemblance to the primary constitutional infirmities that led to *Furman.* In short, statutory PPA review is not a nullity, as appellant says; the intervening decisional law has made it a redundancy. The extensive statutory and decisional restrictions governing the penalty phase of trial, and the ensuing appeal, ensure a robust PPA review just by reaching preserved claims. The PCRA then acts as a second and separate PPA safeguard. The General Assembly may want to revisit PPA review and eliminate the redundancy, as it did when it eliminated proportionality review. Pending legislative reconsideration, the proper way to engage PPA review is per the approach in *Boczkowski.*[5]

Returning to the defaults at issue in this appeal, I recognize that the Commonwealth fails to pursue some obvious waivers, and as noted, the trial court simply proceeded to the merits.

5. Recognition of the federalism-related aspects of the development of Pennsylvania law, as reflected in the history of PPA review, remains timely. Contemporary state courts and state legislatures have had to consider the impact of recent High Court decisions on the administra-

In instances where the Commonwealth, which stands to benefit from the default at issue, does not pursue a default argument—has "waived the waiver"—I have no fixed objection to proceeding to the merits if that is the most efficient manner of disposition. I do so because the Commonwealth's own default should shield the Court from a later claim in federal court that the Court is selectively reinstituting relaxed waiver, and thereby applying a state procedural default rule unevenly. *See Commonwealth v. Paddy*, 609 Pa. 272, 15 A.3d 431, 472 (2011) (Castille, C.J., concurring); *Commonwealth v. Spotz*, 610 Pa. 17, 18 A.3d 244, 343–44 (2011) (Castille, C.J., joined by McCaffery, J., concurring). Nevertheless, I would expressly reject appellant's attempt at instituting a relaxed waiver as-of-right regime.

## II.

I have written previously to address the actions of the FCDO while representing capital defendants in Pennsylvania

tion of criminal justice in a number of areas. Examples include the effect upon the law of evidence resulting from the interpretation of the Confrontation Clause in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and the uneven decisions following *Crawford;* the implementation of broad new rules in capital cases, such as the exemption from the death penalty for the subjectively-defined category of mental retardation, *see Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), or the new procedural requirements for juvenile murderers with uncertain retroactive effect, *see Miller v. Alabama*, —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012); and the realignment in *habeas corpus* law of expectations regarding counsel performance during state collateral review, *see Martinez v. Ryan*, —— U.S. ——, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), and state procedural default rules, *see Trevino v. Thaler*, —— U.S. ——, 133 S.Ct. 1911, 185 L.Ed.2d 1044 (2013). The common denominator in these cases affecting the practical administration of criminal justice within the States is that the U.S. Supreme Court has frequently laid down a broad new constitutional rule, a new refinement, or a new directive, whose consequences in practical implementation (*e.g., Atkins*) or effect upon state processes (*e.g., Martinez* and *Trevino*), in application to new factual scenarios (*e.g., Crawford* ), or in retroactive application (*e.g., Miller*), is not at all clear. Courts and legislatures should be mindful of the peril in prediction, and should be sensitive to the distinct issues of state law arising in the wake of volatile innovations in federal constitutional law. *See, generally, Cunningham*, 622 Pa. 543, 81 A.3d 1 (Castille, C.J., concurring).

state courts. As recounted by the Majority, appellant's trial counsel here did not file either post-verdict motions or a direct appeal from the judgment of sentence. In November 2009, the FCDO filed a PCRA petition in state court on appellant's behalf, seeking to reinstate his appeal rights *nunc pro tunc.* The PCRA court granted the petition and the FCDO filed a notice of appeal. The FCDO also filed a motion for appointment of new counsel, which the trial court did not address. Instead, the trial court ordered appellant to file a Rule 1925(b) statement of issues complained of on appeal. *See* Pa.R.A.P. 1925(b).

The FCDO renewed its application for appointment of new counsel by motion with this Court, averring that "institutional limitations" prohibited the FCDO from representing appellant on direct appeal. Counsel also claimed that appellant signed a "limited retainer agreement," which narrowly circumscribed the FCDO's obligation to the filing of a PCRA petition seeking to restore appellant's direct appeal rights. Finally, the FCDO alleged that it was not prepared to pursue the direct appeal because it had no documents related to the trial, including evidence used at trial or transcripts.

This Court issued a *per curiam* order remanding the matter to the trial court. Our remand order directed the trial court "to ascertain the basis for, and the legitimacy of, counsel's assertions that they are not authorized to continue as appellant's counsel in a direct appeal, as well as to consider Pa.R.P.C. 6.2 and Explanatory Comment (relating to the appointment of counsel)." *Commonwealth v. Sanchez,* 605 Pa. 403, 989 A.2d 1290 (2010) (*per curiam*). The trial court held a hearing and, subsequently, appointed the FCDO to represent appellant on direct appeal.

At the hearing, Rebecca Blaskey, the First Assistant to the Federal Defender, explained the FCDO's authority to represent appellant as follows:

Ms. Blaskey: Your honor, the Federal Community Defender Office is not authorized or permitted to expend federal funds in state court proceedings except under very limited

circumstance [sic], and arguably, a direct appeal proceeding such as this one would not qualify. So as the Federal Community Defender, Your Honor, we are not able to accept appointment in Mr. Sanchez's cases [sic].

The Court: What is the authorization for the Federal Community Defender's Office? What is their scope of representation?

Ms. Blaskey: Your Honor, we represent persons-as the Capital Habeas Unit, we represent death sentenced prisoners in [18 U.S.C. § ] 2254 proceedings in Federal Court, some ancillary proceedings in State Court, and we also present [sic] some [18 U.S.C. § ] 2255 Federal prisoners. We are funded by a grant from the Administrative Office of the United States Courts in Washington D.C., and as such, it [sic] cannot expend federal money in state court proceedings except under limited authorized circumstances.

The Court: You may continue.

Ms. Blaskey: Thank you, Your Honor.

One of the things that I had explained to Your Honor was that, previously, was that the Defender Association of Philadelphia, which is our umbrella organization, has as part of its entity the Pennsylvania Capital Representation Project, which is a non-profit project that does not use federal funds, and if Your Honor would like to appoint our lawyers, what we would request is that Your Honor appoint the Pennsylvania Capital Representation Project rather than the Federal Community Defender.

The Court: Are the lawyers one and the same for both?

Ms. Blaskey: They are, Your Honor.

The Court: And what is the funding of the Pennsylvania Capital Representation Project?

Ms. Blaskey: Your Honor, that is a non-profit 501–C3, and it's funded by private donations and grants.

The Court: And accepting your statement as an officer of the court, they are authorized to represent capital defendants in state court proceedings?

Ms. Blaskey: Yes, Your Honor.

Primarily, as the name implies, we represent capital defendants in post-conviction proceedings. Since this is a direct appeal proceeding, if Your Honor were to appoint us, we could accept that as the Pennsylvania Capital Representation Project.

Petition to Withdraw as Counsel/Appointment of New Counsel Hearing, 6/21/2010, at 3–5. Thus, in spite of the FCDO's initial protestations, FCDO counsel indicated to the trial court that it could be appointed in this matter, so long as it did not use federal funds, and was appointed under the name "the Pennsylvania Capital Representation Project." The Commonwealth did not oppose the appointment. The FCDO then asked that it not be held responsible for "costs such as transcripts" because it was a non-profit entity.

Notably, in the subsequent appeal filed in this Court, the briefs were submitted, not under the rubric of the Pennsylvania Capital Representation Project, but per the "Federal Community Defender Office for the Eastern District of Pennsylvania, Capital Habeas Unit." The question remains, then, whether federal funds have been improperly deployed to support this venture.

Justice SAYLOR, concurring.

I join the initial and final segments of the majority opinion (including the Court's sufficiency and statutory review and the section pertaining to waiver), as well as the treatment of claims I, III, IV, and VII, and I concur in the result relative to the balance of the opinion.

With respect to claim II, I regard the Commonwealth's evidence of Appellant's participation in a proliferation of conspiracies as being very weak. Notably, the decision in *Commonwealth v. Andrews*, 564 Pa. 321, 768 A.2d 309 (2001), upon which the majority relies, involved a crime spree entailing separate criminal encounters at separate locations over the course of two days. *See id.* at 323–24, 768 A.2d at 310. I agree with the majority's alternative disposition, however, in terms of a lack of sufficient prejudice relative to the penalty proceedings. *See* Majority Opinion, at 307–08, 82 A.3d at 976.

In its treatment of claim IV, the majority relies upon a *"sub silentio* determination" of the common pleas court concerning issue preservation. *See* Majority Opinion, at 312–13, 82 A.3d at 978–79. Left to my own devices, I would simply consider the need to resolve the issue-preservation concern to be obviated by the fact that the salient claim lacks merit. *Accord Commonwealth v. Hughes,* 581 Pa. 274, 304–05 n. 13, 865 A.2d 761, 779 n. 13 (2004).

As to the majority's treatment to the prosecutor's various references to "lies" on Appellant's part, *see* Majority Opinion, at 314–15, 82 A.3d at 980–82, I simply cross-reference remarks I have previously offered supporting the admonition that " 'liar' is an epithet to be used sparingly in argument to the jury." *Commonwealth v. Cox,* 581 Pa. 107, 148, 863 A.2d 536, 560 (2004) (Saylor, J., concurring and dissenting) (quoting *Hughes v. State,* 437 A.2d 559, 571 (Del.1981)).

Concerning claim VI and the majority's assessment concerning the absence of counsel during Appellant's first preliminary hearing, I find the necessary analysis to be somewhat more complicated, given that other instances of denials of counsel at critical stages of criminal proceedings have been couched as structural error. *See generally State v. Brown,* 279 Conn. 493, 903 A.2d 169, 179–81 & n. 5 (2006) (discussing some relevant subtleties, while concluding nonetheless that denial of counsel at a preliminary hearing is subject to harmless-error review). Since there are some relevant legal questions pertaining to the Appellant's first and uncounseled preliminary hearing which have not yet been directly addressed by this Court, my preference is to rely on the cure afforded to Appellant in the form of a second, counseled one. *See* Majority Opinion, at 268, 82 A.3d at 952.